STATE of Wisconsin, Plaintiff-Appellant,

v.

Thomas D. TRUDEAU, Trudeau Development, Inc., Trudeau Construction, Inc., Superior Development, Inc., Defendants-Respondents-Petitioners,

The ASHLAND COUNTY BOARD OF ADJUSTMENT, Larry Hildebrandt, Ashland County Zoning Administrator, Defendants-Respondents. †

Supreme Court

*No. 85–0818. Argued April 28, 1987.—Decided June 11, 1987.*

(Also reported in 408 N.W.2d 337.)

† Motion for reconsideration denied.

For the defendants-respondents-petitioners there were briefs by *Samuel J. Recht, David L. Peterson, Susan LaCava, Quarles & Brady,* Milwaukee, *Ronald*

*E. Martell, Gregory M. Bistram, Timothy C. Cook* and *Moore, Costello & Hart,* St. Paul, MN, and oral argument by *Samuel J. Recht* and *Ronald E. Martell.*

For the plaintiff-appellant the cause was argued by *Thomas L. Dosch,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

STEINMETZ, J. The first issue as presented by the parties is whether the land lying below the ordinary high water mark (OHWM) of Lake Superior, which is naturally subject to the flow of water to and from the lake, is part of the bed of Lake Superior even though the water which inundates the site is not navigable. The Ashland county circuit court, the Honorable William E. Chase, held that the disputed property was not lakebed because the plaintiff, state of Wisconsin, failed to prove that the condominium project site was navigable. The court of appeals, in an unpublished decision, reversed holding that the actual navigability of the site is irrelevant if the land lies partly under the OHWM of Lake Superior and found, on the basis of what it termed positive, uncontradicted testimony, that the site is partly the bed of Lake Superior because it is naturally below the ordinary high water mark of the lake and subject to the ebb and flow of the lake.

The second issue is whether the court of appeals committed error in supplementing the findings of the trial court on the issue of the natural connection of the project site to Lake Superior. The trial court failed to make any findings on the relative elevations of the project site and the ordinary high water mark of Lake Superior. Although the trial court found that the project site was subject to inundation by water from

93

Lake Superior, it dismissed the state's lakebed claim on the basis that the site was not navigable. The court of appeals found that there was evidence that part of the site was under the OHWM of Lake Superior and that there was a water connection between the site and the lake with water flowing between the site and lake, and, therefore, remanded the case to the trial court to determine what part of the site if any is below the OHWM.

The third issue is whether doctrines of accretion or reliction have any application to a dispute over land not submerged by the waters of Lake Superior when those waters reached the elevation of the lake's ordinary high water mark. The trial court found that the doctrine of reliction operated to give title to the defendants, Thomas D. Trudeau, Trudeau Development, Inc., Trudeau Construction, Inc., and Superior Development, Inc., real estate developers, because the connection of the site to the lake had receded to the point of rendering use of the land as an incident of navigation improbable. The court of appeals held that the doctrine of reliction has no application to the submerged lands.

The fourth issue is whether under the facts of this case certiorari review under sec. 59.99, Stats.,[1] is the

[1]Sec. 59.99(1) and (10), Stats., provides:

"**59.99 County zoning, adjustment board.**
(1) APPOINTMENT, POWER. The county board may provide for the appointment of a board of adjustment, and in the regulations and restrictions adopted pursuant to sec. 59.97 may provide that such board of adjustment may, in appropriate cases and subject to appropriate conditions and safeguards, make special exceptions to the terms of the ordinance in harmony with its general purpose and intent and in accordance with general or specific rules therein contained. Nothing in this subsection shall preclude the granting of special exceptions by the county zoning

state's exclusive means of challenging a floodplain zoning variance. The trial court held that certiorari review was the state's exclusive means of challenging a decision to grant a floodplain zoning variance and found that the state had failed to pursue review within the time provided by the statute. The court of appeals held that sec. 87.30(2),[2] provided the state with

agency designated under sec. 59.97(2)(a) or the county board in accordance with regulations and restrictions adopted pursuant to sec. 59.97 which were in effect on July 7, 1973 or adopted after that date."

"(10) CERTIORARI. Any person or persons, jointly or severally, aggrieved by any decision of the board of adjustment, or any taxpayer, or any officer, department, board or bureau of the municipality, may, within 30 days after the filing of the decision in the office of the board, commence an action seeking the remedy available by certiorari. The court shall not stay proceedings upon the decision appealed from, but may, on application, on notice to the board and on due cause shown, grant a restraining order. The board of adjustment shall not be required to return the original papers acted upon by it, but it shall be sufficient to return certified or sworn copies thereof. If necessary for the proper disposition of the matter, the court may take evidence, or appoint a referee to take evidence and report findings of fact and conclusions of law as it directs, which shall constitute a part of the proceedings upon which the determination of the court shall be made. The court may reverse or affirm, wholly or partly, or may modify, the decision brought up for review."

[2]Section 87.30(2), Stats., provides as follows:

"(2) ENFORCEMENT AND PENALTIES. Every structure, building, fill, or development placed or maintained within any floodplain in violation of a zoning ordinance adopted under this section, or sec. 59.97, 61.35 or 62.23 is a public nuisance and the creation thereof may be enjoined and maintenance thereof may be abated by action at suit of any municipality, the state or any citizen thereof. Any person who places or maintains any structure, building, fill or development within any floodplain in violation of a zoning ordinance adopted under this section, or sec. 59.97, 61.35 or 62.23 may be fined not more than $50 for each

95

an alternative means of challenging a floodplain zoning variance.

This action concerns a parcel of land being developed for a 48-unit, eight-building, residential condominium project. Six of the units in one building were constructed prior to the commencement of this action and substantial sums of money have been invested in the project.

The state of Wisconsin commenced this action on August 16, 1984. The various claims in the amended complaint relate to two sets of parties: a group of real estate developers and several local zoning officials or agencies. The Ashland County Board of Adjustment, Larry Hildebrandt, Ashland County Zoning Administrator and Thomas D. Trudeau, Trudeau Development, Inc., Trudeau Construction, Inc. and Superior Development, Inc. (the developers) were alleged to have violated sec. 30.12, Stats.[3] by allowing construc-

---

offense. Each day during which such violation exists is a separate offense."

[3]Sec. 30.12(1)(b), (2), (3)(a) 4 and (b), Stats., provides in relevant part:

"**30.12 Structures and deposits in navigable waters prohibited; exceptions; penalty.** (1) GENERAL PROHIBITION. Except as provided under sub. (4), unless a permit has been granted by the department pursuant to statute or the legislature has otherwise authorized structures or deposits in navigable waters, it is unlawful:

". . .

"(b) To deposit any material or to place any structure upon the bed of any navigable water beyond a lawfully established bulkhead line.

"(2) PERMITS TO PLACE STRUCTURES OR DEPOSITS IN NAVIGABLE WATERS; GENERALLY. The department, upon application and after notice as provided under sec. 31.06 and hearing, may grant to any riparian owner a permit to build or maintain for

---

tion and constructing condominiums and a parking lot on the bed of Lake Superior.

The developers obtained a variance at a hearing before the Ashland County Board of Adjustment on January 13, 1984. The state did not seek review of the decision pursuant to sec. 59.99(1), Stats., within 30 days. The state later commenced an action against the developers alleging that the construction was not, could not have been, authorized and lawful. The trial court dismissed all of the state's claims after a trial.

According to the state, the first meeting regarding the site was on November 1, 1983, at the site. After being discouraged by the Department of Natural Resources (DNR) representative, the developers withdrew their existing plans. The DNR did not receive any other plans. The next the DNR heard of the matter was when it was notified of the variance hearing before the Ashland County Board of Adjust-

the owner's use a structure otherwise prohibited by statute, if the structure does not materially obstruct navigation or reduce the effective flood flow capacity of a stream and is not detrimental to the public interest. The procedures in this subsection do not apply to permits issued under sub. (3).

"...

"4. Place crushed rock or gravel, reinforced concrete planks, adequately secured treated timbers, cast in place concrete or similar material on the bed of a navigable stream for the purpose of developing a ford if an equal amount of material is removed from the stream bed.

"(b) A person who seeks to place structures or deposits under par. (a) shall apply to the department for a permit. The department shall review the application and inspect the location involved. The department may disapprove the application if it finds the proposed structure or deposit will materially impair navigation or be detrimental to the public interest. The department shall issue the permit or notify the application in writing of the disposition of the application."

ment in January, 1984. By that time, the project pilings were in, walls were up and deck floors were in so that the variance was granted after the fact of partial construction.

The state requested injunctive relief requiring the removal of structures found to be in violation of sec. 30.12, Stats., or local zoning ordinances, the prohibition of further construction on the lakebed, and an order vacating the land use permit and floodplain zoning variance given to the developers.

The controversy concerns a real estate development known as the Marina Point Condominiums on Madeline Island in Ashland county, Wisconsin. The developers' plans are to build 48 condominiums in a series of clusters. The first set of six condominiums, known as Cluster A, has already been built and the units placed for sale. The building site is immediately across Old Fort Road from the Madeline Island marina and immediately south of Mondamin Trail. A golf course is adjacent to the site on its inland side. Cluster A has been built on stilt-like pilings and much of the land underlying the structure and the remainder of the site is covered by standing water which was as deep as 1.2 feet in October, 1984. The water on the site is connected by several culverts to Lake Superior, at least one running under Old Fort Road into the marina and another running under Mondamin Trail. (See Exhibit 1 attached to this opinion.)

There is generally some water on the project site and some aquatic-type vegetation. The project site itself is not "navigable" in the sense of paddling a canoe. The source of the water on the property is not entirely clear. There was evidence received that 1.3 million gallons of water per week drained from the golf course onto the project site in the summer. Water

also came through the culverts from Lake Superior when high winds arose. Both parties agree the culverts' purpose was to allow water to drain to Lake Superior rather than accumulate on the project site. The state argues that the culverts were not placed under the Old Fort Road to flood the developers' project but to allow water accumulating there to reach the lake. If the culverts were not there, it is argued the project site would flood and run across the road to Lake Superior or the site would accumulate water and become lakebed itself.

The trial court found that water flows both ways through these culverts, sometimes draining the Marina Point Condominiums site into the main body of Lake Superior and sometimes further flooding the site with water coming in from the marina.

The trial court made no finding as to the elevation of the ordinary high water mark (OHWM) of Lake Superior or of the elevations of the surface of the water or the underlying land at the Marina Point Condominiums site as compared to the OHWM of Lake Superior. The trial court found there was "no distinct mark on the project property" and that the disputed property was separated from Lake Superior as a navigable body of water by Old Fort Road, an artificial barrier. The state introduced the only evidence regarding the OHWM of Lake Superior.

Contrary to the developers' argument, sec. 59.99(10), Stats., is not the exclusive means of state jurisdiction over floodplain zoning. Section 87.30 and sec. NR 116.22(4), Wis. Adm. Code, provide that the state may seek abatement of violations of floodplain

zoning.[4] Section 87.30(2) establishes a cause of action to enjoin a public nuisance whenever there exists a violation of any local floodplain zoning ordinances. The state of Wisconsin, by the attorney general, is authorized to bring actions to enjoin such nuisances. To regard certiorari as the exclusive means of review would render the language of sec. 87.30(2), Stats.,

---

[4]Sec. NR 116.22(4), Wis. Adm. Code provides as follows:

"(4) ENFORCEMENT. The department shall assist municipalities in achieving a consistent statewide approach to floodplain enforcement. This assistance may include, but is not limited to, the measures listed in this subsection.

"(a) The department may request that corrective action be taken by the municipality where construction is occurring in a floodplain area which is either contrary to an existing floodplain zoning ordinance or which would be contrary to an approved floodplain zoning ordinance. Such corrective action may include, where appropriate, the following:

"1. Active prosecution of violations of the floodplain zoning ordinance;

"2. An injunction to stop construction until an adequate floodplain zoning ordinance can be adopted and approved by the department; and

"3. Adoption of an adequate floodplain zoning ordinance and submittal to the appropriate department district office for approval.

"(b) The department may seek an injunction to stop construction in the floodplain area until an adequate floodplain zoning ordinance is adopted and approved.

"(c) The department may seek an injunction to stop construction in the floodplain area when the construction would violate an approved floodplain zoning ordinance or the provisions of this chapter.

"(d) The department may seek adoption of an adequate floodplain zoning ordinance in accordance with the provisions of sec. 87.30(1), Stats., or an upgrading of a floodplain zoning ordinance in accordance with s. NR 116.05.

"(e) The department may seek an injunction for abatement or removal or a fine or both for any violation of a floodplain zoning ordinance in accordance with sec. 87.30(2), Stats."

meaningless which is a construction the courts should avoid. *Associated Hospital Service v. Milwaukee,* 13 Wis. 2d 447, 463, 109 N.W.2d 271 (1961).

Section 30.12 and ch. 30, Stats., generally codify a number of common law doctrines regarding the ownership of the beds of navigable waters. This court stated in *Illinois Steel Co. v. Bilot,* 109 Wis. 418, 425, 84 N.W. 855 (1901):

> "The title to the beds of all lakes and ponds, and of rivers navigable in fact as well, *up to the* line of ordinary high-water mark, within the boundaries of the state, became vested in it at the instant of its admission into the Union, in trust to hold the same so as to preserve to the people forever the enjoyment of the waters of such lakes, ponds, and rivers, to the same extent that the public are entitled to enjoy tidal waters at the common law." (Emphasis added.) *See also State v. McDonald Lumber Co.,* 18 Wis. 2d 173, 176, 118 N.W.2d 152 (1962).

This is as true of the beds of the Great Lakes as it is of lesser inland waters.

In *Muench v. Public Service Comm.,* 261 Wis. 492, 501–02, 53 N.W.2d 514, 55 N.W.2d 40 (1952), the court stated:

> "At an early date in its history the Wisconsin court put itself on record as favoring the trust doctrine, that the state holds the beds underlying navigable waters in trust for all of its citizens, subject only to the qualification that a riparian owner on the bank of a navigable stream has a qualified title in the stream bed to the center thereof."

■Title to the lakebeds passed to the state upon statehood. *Pollard's Lessee v. Hagan,* 44 U.S. (3 How.) 212, 230 (1845) stated:

"First, The shores of navigable waters, and the soils under them, were not granted by the Constitution to the United States, but were reserved to the states respectively. Secondly, The new states have the same rights, sovereignty, and jurisdiction over this subject as the original states."

Section 30.12, Stats., is a codification of the common law restriction against encroachments on publicly held lakebeds. *See Hixon v. Public Service Comm.,* 32 Wis. 2d 608, 616, 146 N.W.2d 577 (1966).

We have distinguished between state owned lakebed and the uplands[5] capable of private ownership in *Diana Shooting Club v. Husting,* 156 Wis. 261, 272, 145 N.W. 816 (1914) when we stated:

"By ordinary high-water mark is meant the point on the bank or shore up to which the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction of terrestrial vegetation, or other easily recognized characteristic. *Lawrence v. American W. P. Co.,* 144 Wis. 556, 562, 128 N.W. 440. And where the bank or shore at any particular place is of such a character that it is impossible or difficult to ascertain where the point of ordinary high-water mark is, recourse may be had to other places on the bank or shore of the same stream or lake to determine whether a given stage of water is above or below ordinary high-water mark."

For purposes of determining the extent of control of the public trust "it is immaterial what the character of the stream of water is. It may be deep or shallow, clear or covered with aquatic vegetation." *Id.*

---

[5] "Uplands—Land bordering bodies of water but above the high water mark." The Real Estate Dictionary (3d ed. 1984).

The trial court used the incorrect legal standard when it acknowledged the connection of the lake to the property by water flowing to and from the site but decided the land was not Lake Superior lakebed because of the state's "failure to prove that the project land is navigable."

The question of whether the facts in a particular case fulfill a particular legal standard is a question of law which this court will review. *Hennekens v. River Falls Pol. & Fire Comm.,* 124 Wis. 2d 413, 424, 369 N.W.2d 670 (1985). Where a trial court bases its decision on a mistaken view of the law, its decision constitutes an abuse of discretion as a matter of law. *Schmid v. Olsen,* 111 Wis. 2d 228, 237, 330 N.W.2d 547 (1983).

An area need not be navigable to be lakebed. If the land is part of the navigable lake, then the fact that the specific area cannot be navigated is irrelevant to the state's claim. Lakebed may be heavily vegetated by plants rising far above the water. The court of appeals stated in *Houslet v. Natural Resources Department,* 110 Wis. 2d 280, 287, 329 N.W.2d 219 (Ct. App. 1982):

> "[T]he public interest in and title to the navigable waters in this state attaches to more than the open and perpetually navigable waters contained in lakes, rivers and streams. It extends to areas covered with aquatic vegetation within the ordinary high water mark of the body of water in question."

Public ownership of the bed applies whether the water is deep or shallow. *Diedrich v. The N. W. U. R'y. Co.,* 42 Wis. 248, 266 (1877) stated:

> "And the reason of the rule [that the public trust of the lakebed or river bottom cannot be part of private lands] applies equally, whether the water immediately next the shore be shoal or deep. For the fee is equally in the public; even the shoal water next the shore may aid the public use, and may deepen or be deepened, so as to become practically capable of navigation."

The developers' reliance on *DeGayner & Co. v. DNR,* 70 Wis. 2d 936, 236 N.W.2d 217 (1975) is misplaced. *DeGayner* answered the question: "What is a 'navigable stream'"? Lake Superior is admittedly navigable, and therefore *DeGayner* does not assist in analysis. The issue in the current case is where a navigable body of water is identified, what are the boundaries of the public trust associated with the bed of that body of water. Lake Superior is navigable and if the non-navigable site is a part of the lake, then the land below the OHWM is held in trust for the public.

The rights Wisconsin citizens enjoy with respect to bodies of water held in trust by the state include the enjoyment of natural scenic beauty as well as the purposes of navigation, swimming and hunting. In *Just v. Marinette County,* 56 Wis. 2d 7, 17, 201 N.W.2d 761 (1972) we stated the public has a present right to preserve natural resources such as wetlands because wetlands:

> "[S]erve a vital role in nature, are part of the balance of nature and are essential to the purity of the water in our lakes and streams. Swamps and

wetlands are a necessary part of the ecological creation and now, even to the uninitiated, possess their own beauty in nature."

The trial court found the state failed to prove the "height and sufficiency of the hydraulic connection." It appears from the record the trial court was referring to the supposed absence of evidence relating to the height of the culverts connecting the site with Lake Superior, not the absence of evidence as to the pre-existing conditions of the naturally occurring inlet where the marina was built. It is obvious that hydraulic connection has no meaning other than being connected by water. There is a great deal of evidence in the record that historically shows an open-water inlet crossing under the Old Fort Road and extending east into a wetland on the inland side of the road. The court of appeals did not err in finding that the site is part of a basin naturally connected to Lake Superior.

Developers argue that they submitted proof of a chain of title to the site demonstrating that the site was never lakebed. The original federal patent to the site was dated April, 1856, approximately eight years after Wisconsin became a state. As of the date of statehood, Wisconsin obtained absolute title to the beds of navigable waters like Lake Superior which could not be defeated by a subsequent federal patent relating to the lands. *State Land Board v. Corvallis Sand & Gravel Co.,* 429 U.S. 363 (1977). *See also Angelo v. Railroad Commission,* 194 Wis. 543, 550, 217 N.W. 570 (1928).

The trial court did not find nor is there any evidence to support the fact that the project site is entirely dry land above the OHWM of Lake Superior. There is no evidence nor finding that would support a

legal conclusion that the doctrine of reliction has any application to this case.[6]

The developers also argue they are entitled to the land under the operation of accretion. That doctrine, like reliction, relates only to land above the OHWM. Accretion refers to dry lands which no longer form part of the bed of a water body. *De Simone v. Kramer,* 77 Wis. 2d 188, 197, 252 N.W.2d 653 (1977): "Accretion has been defined as 'the increase in land caused by the gradual deposit by water of materials on the shores, which deposit replaces the water at this location with dry land.'" The doctrine of accretion is not relevant since the state claims only lands lying below the OHWM.

The trial court made an error of law when it assumed that the site itself had to be navigable in fact in order to be considered Lake Superior lakebed. The state holds in public trust "[t]he title to the beds of all lakes ... up to the line of ordinary high-water mark ...." *Illinois Steel,* 109 Wis. 418, 425. The state regulates navigable waters through sec. 30.12(1), Stats. The question is whether some or all of the project site is within Lake Superior's OHWM, not whether it is navigable.

The trial court failed to make OHWM findings even though the state presented evidence establishing Lake Superior's and the site's OHWM. The DNR's area water management specialist, Richard Knitter, testified that he determined the lake's OHWM approximately one-half mile from the site at a protected

---

[6]Black's Law Dictionary (5th ed. 1979) defines "reliction" as: "An increase of the land by the permanent withdrawal or retrocession of the sea or a river. Process of gradual exposure of land by permanent recession of body of water."

location with a clear erosion line that was free from excessive wave action. Knitter then determined that this site's elevation was 602 feet I.G.L.D.[7] He transferred the elevation of the OHWM site to a number of points at the project site and concluded that approximately half of the site was below Lake Superior's OHWM.[8] The developers' surveyor did not determine the OHWM of the site or Lake Superior.

In *State v. McFarren,* 62 Wis. 2d 492, 498, 215 N.W.2d 459 (1974), we stated:

> "The term 'ordinary high-water mark' was most recently defined in *State v. McDonald Lumber Co.* [(1962), 18 Wis. 2d 173, 176, 118 N.W.2d 152, quoting from *Diana Shooting Club v. Husting* (1914), 156 Wis. 261, 272, 145 N.W. 816]:
>
> " ' "By ordinary high-water mark is meant the point on the bank or shore up to which the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction of terrestrial vegetation, or other easily recognized characteristic. *Lawrence v. American W. P. Co.,* 144 Wis. 556, 562, 128 N.W. 440. And where the bank or shore at any particular place is of such a character that it is impossible or difficult to ascertain where the point of ordinary high-water mark is, recourse may be had to other places on the bank or shore of the same stream or lake to

[7]I.G.L.D. is an abbreviation for International Great Lakes Datum, a reference system used for expressing elevations in the Great Lakes area.

[8]The ordinary high water mark transfer rule was developed to promote certainty and ascertain property rights in riparian lands. An ABA publication strongly recommends its ascertainment prior to construction. *Real Property, Probate and Trust Journal,* Vol. 18, No. 3 (Fall 1983).

determine whether a given stage of water is above or below ordinary high-water mark." '

"In *McDonald* it was stated that the state's title to the lake bed runs to the ordinary high-water mark." (Footnotes omitted.)

The trial court did not make a finding whether the site was connected by water to Lake Superior; however, the trial judge did make this observation, "sometimes water goes into the culvert ... from the marina onto the project property and sometimes it flows out from the project property ...."

Knitter analyzed several aerial photographs of the site as it existed in 1939 and 1950, the government survey maps, the site's present configuration, and stereo photographs offering a three-dimensional view of the site indicating elevation and from these sources he concluded that the project site was originally part of the basin, which was enlarged to become the present marina. The developers' expert did not directly refute this evidence.

When the physical facts are unquestionably established, testimony to the contrary must give way. *Pappas v. Jack O. A. Nelsen Agency, Inc.,* 81 Wis. 2d 363, 369, 260 N.W.2d 721, 724 (1978). In *Thiel v. Damrau,* 268 Wis. 76, 85, 66 N.W.2d 747, 752 (1954), the court stated: "Positive uncontradicted testimony as to the existence of some fact, or the happening of some event, cannot be disregarded by a court or jury in the absence of something in the case which discredits the same or renders it against the reasonable probabilities."

The positive and uncontradicted testimony of Knitter that the OHWM of Lake Superior is 602

I.G.L.D. and that the project site was and is hydraulically connected to and is in fact a part of Lake Superior is not discredited nor against reasonable probability. The erection of the artificial barrier, the Old Fort Road, with culverts between the site and the marina does not remove the site as part of Lake Superior. As long as lake water would naturally flow to and from the site in the absence of an artificial barrier, it is a part of Lake Superior. The state therefore properly determined the lake's OHWM at "other places on the ... shore of the same ... lake" and transferred that finding to the project site. *Diana Shooting Club,* 156 Wis. at 272.

The state claims about half of the site is below 602 feet I.G.L.D. The developers' surveyor, while originally agreeing, later claimed that all of the site was above the 602 feet OHWM. The trial court did not resolve conflicts as to the elevations on the site.

We affirm the court of appeals and therefore remand the case to the trial court for findings as to the various elevations of the project site. Any part of the site at or below 602 feet I.G.L.D. is within the OHWM of Lake Superior and is therefore protected lakebed upon which building is prohibited. Any part of the site above 602 feet is still within the floodplain of Lake Superior and falls within the county's jurisdiction.

The board did not and could not properly grant the developers a floodplain variance as to any part of the site below the OHWM of Lake Superior. Ashland county adopted a floodplain ordinance pursuant to secs. 59.97 and 87.30, Stats. The board may grant a variance only if the grant "will not be contrary to the public interest" and "owing to special conditions, a literal enforcement ... would result in unnecessary hardship." Ashland County Flood Plain Zoning Ordi-

nance, sec. 7.34 (April 21, 1981); sec. NR 116.21(4), Wis. Adm. Code (1986). Also, a variance "[s]hall be consistent with the spirit and intent of this ... ordinance" and shall not be granted "solely on the basis of economic gain or loss" nor for "a self-created hardship." Ashland County Flood Plain Zoning Ordinance, sec. 7.34(a), (g) and (h) (1981); Wis. Adm. Code NR 116.21(4) (1986).

The board neglected making any findings as to whether the proposed project will be contrary to the public interest, whether the site has a special condition, and whether this special condition would result in unnecessary hardship. The board also failed to find whether the variance would be granted solely for an economic gain or loss and whether there is a self-created hardship.

We remand the case to the circuit court with directions to remand the matter to the board of adjustment for findings concerning those portions of the site higher than 602 feet, the OHWM of Lake Superior. The board must make appropriate findings supporting its conclusion so a meaningful judicial review is possible. *See State ex rel. Ruthenberg v. Annuity & Pension Bd.,* 89 Wis. 2d 463, 478, 278 N.W.2d 835, 842 (1979). The board is required to include findings on public interest, special conditions and unnecessary hardships as well as any of the relevant eight factors set out in sec. 7.34 of the Ashland County Flood Plain Zoning Ordinance. To be considered also is the Ashland county ordinance requirement for a 75 foot set-back from the lakebed as found by the trial court.

The decision of the court of appeals is affirmed and the case is remanded to the trial court for factfinding consistent with this opinion for findings as

to that portion of the site found by the trial court to be above 602 feet I.G.L.D.

*By the Court.*—The decision of the court of appeals is affirmed.

Exhibit 1

Lake Superior

Old Fort Road

Condominiums

Golf Course

Marina

Mondamin Trail