STATE of Wisconsin, Plaintiff-Respondent,

v.

John W. KELLEY and Peter M. Kelley, Defendants-
Appellants-Petitioners,†

ARNOTT TRUCKING, INC., Defendant.

Supreme Court

*No. 99–1066. Oral argument February 12, 2001.—Decided
July 3, 2001.*

2001 WI 84

(Also reported in 629 N.W.2d 601.)

†Motion for Reconsideration denied 9-21-01.

For the defendants-appellants-petitioners there were briefs by *Richard J. Weber* and *Kelley, Weber, Pietz & Slater, S.C.*, Wausau, and oral argument by *Richard J. Weber*.

For the plaintiff-respondent the cause was argued by *Steven E. Tinker*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

¶ 1. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE. This is a review of an unpublished decision of the court of appeals[1] affirming a judgment of the Circuit Court for Oneida County, Robert E. Kinney, Circuit Court Judge. The circuit court granted summary judgment in favor of the State, holding that

[1] *State v. Kelley*, No. 99–1066, unpublished slip op. (Wis. Ct. App. Feb. 8, 2000).

defendants John W. Kelley and Peter M. Kelley had violated Wis. Stat. §§ 30.12(1)(a), 30.15(1)(a), and 30.15(1)(d) (1997–98)[2] by depositing fill on a 200-foot section of land submerged at times by Lake Killarney, a navigable water, without a permit. The court of appeals affirmed the judgment of the circuit court.

¶ 2.   We consider three arguments raised by the Kelleys for reversing the judgment of the circuit court.

¶ 3.   First, the Kelleys argue that they were not required to obtain a permit pursuant to Wis. Stat. § 30.12(1)(a) before depositing fill on a 200-foot section of their land because the land was not the bed of navigable water. The Kelleys assert that the 200-foot section was not the bed of navigable water because in 1988 when the fill was deposited, the 200-foot strip was above the ordinary high water mark. The State, however, argues that so long as the land is submerged below navigable water, a permit is required and the location of the ordinary high water mark is irrelevant.

¶ 4.   Second, the Kelleys raise constitutional challenges, involving uncompensated taking, excessive fines, and a five-year delay in enforcement.

¶ 5.   Third, the Kelleys argue that they were entitled to summary judgment because the water levels in the lake were higher than the permit for the dam allowed.

¶ 6.   We address these three arguments in turn. As to the first issue, neither the Kelleys nor the State offers authority for their positions, cites legislative history to aid us in determining the intent of the legislature in interpreting Wis. Stat. § 30.12(1)(a), or discusses the consequences to the public and the administration of chapter 30 should the Court adopt

_____

[2] All subsequent references to the Wisconsin Statutes are to the 1997–98 version unless otherwise indicated.

either of their interpretations of Wis. Stat. § 30.12(1)(a).

¶ 7. The first issue is whether a property owner is required to obtain a permit before depositing fill on land submerged below navigable water regardless of whether the land is above or below the ordinary high water mark. This issue presents a complex question that affects not only the parties to the present lawsuit but the people of the State of Wisconsin. Because this issue has not been sufficiently explored in the briefs or at oral argument to enable us to decide it, this case provides an inappropriate vehicle for resolving the issue the case presents. Nevertheless, because the issue seems to be of statewide importance, we take the unusual step of remanding the matter to the circuit court where the parties can develop the facts and legal analysis to enable the circuit court to address the legal issue presented.

¶ 8. As to the second issue, we conclude that the constitutional arguments are not fully developed and, as presented, are unpersuasive for the reasons set forth below.

¶ 9. As to the third issue, we conclude, as did the circuit court, that the dam permit did not set forth mandatory water levels and that therefore the water levels about which the Kelleys complain do not violate the dam permit.

¶ 10. Accordingly, we reverse the decision of the court of appeals and remand the cause to the circuit court to determine whether the Kelleys were required in 1988 to obtain a permit from the Department of Natural Resources before depositing fill on their 200-foot section of land.

¶ 11.   At the center of this case are a town dam and property belonging to the Kelley family. The Town of Little Rice completed the construction of a town dam on the Little Rice River in 1961, creating Lake Killarney. The Kelleys own property bordering the lake.

¶ 12.   The western edge of the Kelleys' property includes a parcel of land known as Pete's Point. During certain periods of high water, the old logging roads leading to Pete's Point are submerged, turning Pete's Point from a peninsula into an island.

¶ 13.   In the fall of 1988, the Kelleys hired a trucking company to deposit fill on a section of land, 200 feet long by 20 feet wide, that was at times submerged. No Department of Natural Resources (DNR) permit has been applied for or issued to deposit the fill.

¶ 14.   In October 1988, the DNR received a letter from Allan Konkol, a regular user of Lake Killarney. Konkol informed the DNR that he and his wife had, in prior years, frequently canoed over the submerged 200-foot section of land and in October 1988 were unable to do so because of the fill. Konkol asked whether the DNR had granted a permit for this fill. As part of the DNR's investigation into this complaint, a DNR representative located the filled area in May 1989.

¶ 15.   On June 25, 1990, the DNR took measurements to determine whether the fill was below the ordinary high water mark of Lake Killarney. The ordinary high water mark is the point on the bank or shore up to which the presence and action of the water is so continuous as to leave a distinct mark either by ero-

sion, destruction of terrestrial vegetation, or other easily recognized characteristic.[3]

¶ 16. The State filed a civil proceeding against the Kelleys on November 22, 1993, alleging violations of Wis. Stat. §§ 30.12(1)(a), 30.15(1)(a), and 30.15(1)(d) and seeking an injunction ordering the Kelleys to remove the fill and pay a forfeiture and penalties.

¶ 17. The trial began in January 1995. After the first witness testified, the circuit court suggested that although there were disputed facts, the legal issues might be resolved on summary judgment and stipulated facts. The parties agreed, and the Kelleys moved for summary judgment based on a stipulated statement of facts, the pleadings, answers to interrogatories, and supporting affidavits submitted by the parties.[4]

¶ 18. The circuit court granted summary judgment in favor of the State, and thereafter the Kelleys moved to dismiss the State's action, raising various constitutional challenges to the summary judgment. In particular, the Kelleys contended that the State's five-year delay in filing this civil action was unconstitutional, because daily forfeitures for the entire period of violation were coercively high and because potential defense witnesses had died prior to trial.

¶ 19. The circuit court prudently commented that the motion to dismiss should have been brought before trial and expressed surprise that the defendants brought the motion after the circuit court had granted summary judgment. The circuit court nevertheless pro-

---

[3] *State v. McDonald Lumber Co.*, 18 Wis. 2d 173, 176, 118 N.W.2d 152 (1962) (quoting *Diana Shooting Club v. Husting*, 156 Wis. 261, 272, 145 N.W. 816 (1914)).

[4] The parties entered into a stipulation that set forth five legal issues and nine stipulated facts.

ceeded to hear the constitutional objections and then denied the motion to dismiss.

¶ 20.    The circuit court granted the State injunctive relief, ordering the Kelleys to remove the offending portions of the fill and to pay a forfeiture. The court of appeals affirmed the decision of the circuit court. The Kelleys have removed the fill.

## II

¶ 21.    The first issue in this case is whether the circuit court erred in holding that the Kelleys violated Wis. Stat. § 30.12(1)(a) by failing to obtain a permit from the DNR to deposit fill on the 200-foot section of land in question.[5]

¶ 22.    The circuit court granted summary judgment in favor of the State.[6] The Kelleys now assert that summary judgment should not have been granted because a dispute of material facts exists.[7] But a

---

[5] The circuit court also determined that the Kelleys had violated Wis. Stat. § 30.15(1)(a) and (d). These sections provide that any person who "[u]nlawfully obstructs any navigable water and thereby impairs the free navigation thereof" or "[c]onstructs or places any structure or deposits any material in navigable waters in violation of s. 30.12 or 30.13" forfeits not less than $10 or not more than $500 for each offense.

The circuit court, court of appeals, and the parties addressed Wis. Stat. § 30.12(1)(a). Neither the courts nor the parties explicitly addressed § 30.15(1)(a) and (d). We do not address § 30.15(1)(a) and (d).

[6] "If it shall appear to the court that the party against whom a motion for summary judgment is asserted is entitled to a summary judgment, the summary judgment may be awarded to such party even though the party has not moved therefor." *See* Wis. Stat. § 802.08(6).

[7] Summary judgment is properly granted when there are no disputed issues of material fact and the moving party is entitled

motion for summary judgment carries with it the explicit assertion that the movant, here the Kelleys, is satisfied that the material facts are undisputed and that on those facts summary judgment is justified as a matter of law.[8] Accordingly, the court of appeals concluded that the Kelleys waived their right to allege that disputed material facts entitle them to a hearing. We disagree with the court of appeals.

¶ 23. We agree with the Kelleys that the legal issue presented in their summary judgment motion was essentially whether they had the right to deposit fill on the flooded roads without a permit if the DNR was not properly maintaining a water level of 112 feet in accordance with the dam permit. The Kelleys did not succeed on this theory because the circuit court determined that the dam permit did not require a water level of 112 feet.

¶ 24. As the case proceeded through the courts, however, another legal issue was introduced, namely, whether the Kelleys had to obtain a permit before depositing fill on the 200-foot section of land depends on whether the land was above or below the ordinary high water mark. The parties' stipulation of facts stated that the DNR first established an ordinary high water mark on June 25, 1990. The stipulation further stated that fill material had been placed in some spots

to judgment as a matter of law. *Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶ 24, 241 Wis. 2d 804, 623 N.W.2d 751.

An appellate court reviews a circuit court's grant of summary judgment independently of the circuit court or court of appeals, benefiting from those courts' analyses. *Lambrecht*, 2001 WI 25, ¶ 21.

[8] *Powalka v. State Mut. Life Assurance Co.*, 53 Wis. 2d 513, 518, 351 N.W.2d 852 (1972).

below the ordinary high water mark, as calculated by the State on June 25, 1990. The parties did not stipulate about the location of the ordinary high water mark in 1988.

¶ 25.  The parties now dispute whether the 200-foot section of land was above or below the ordinary high water mark in 1988 when the fill was deposited. The circuit court's decision to grant summary judgment to the State was based in part on the parties' stipulation regarding the ordinary high water mark identified by the DNR in 1990. No evidence was presented, however, to identify the ordinary high water mark in 1988 when the fill was deposited. Indeed, in deposition testimony, various DNR officials conceded that the ordinary high water mark measured in June 1990 does not necessarily reflect the ordinary high water mark that existed in 1988. Thus, the Kelleys are correct in their assertion that the factual issue of whether the fill was deposited below the ordinary high water mark in 1988 is disputed.

■

¶ 26.  No disputed issue of material fact existed with respect to the legal issue on which the parties in the present case originally sought summary judgment, namely, whether the DNR's alleged failure to maintain the dam properly entitled the Kelleys to deposit fill without a permit. This case involves an additional legal issue whose resolution may depend on a disputed issue of material fact, namely, the location of the ordinary high water mark in 1988 to determine whether the 200-foot section of land is the bed of navigable water. Because the legal issue upon which summary judgment was granted is different from the legal issue on which the Kelleys' motion for summary judgment was

based,[9] we conclude that the Kelleys have not waived their right to allege that disputed material facts exist barring a summary judgment.

¶ 27.  We turn to the relevant statute, Wis. Stat. § 30.12(1)(a), which makes it unlawful to deposit any material upon the bed of any navigable water where no bulkhead line has been established. Section 30.12(1) reads as follows:

> [U]nless a permit has been granted by the department pursuant to statute or the legislature has otherwise authorized structures or deposits in navigable waters, it is unlawful:
>
> (a)  To deposit any material or to place any structure upon the bed of any navigable water where no bulkhead line has been established. . . .[10]

¶ 28.  A permit is therefore required under Wis. Stat. § 30.12(1)(a) if the State establishes these four elements: (1) the Kelleys deposited material (2) upon the bed (3) of any navigable water (4) where no bulkhead line has been established.

¶ 29.  The first and fourth elements are not disputed: The Kelleys deposited fill and no bulkhead line has been established.

---

[9] The court has recognized that different legal issues raise different issues of material facts for purposes of summary judgment in the context of reciprocal motions for summary judgment and that an issue of fact that was not material under one legal theory might be material to another legal theory. *Ziegler Co. v. Rexnord, Inc.*, 139 Wis. 2d 593, 595 n.1, 407 N.W.2d 873 (1987).

[10] "Bulkhead line" is the statutory term for a legislatively established shoreline. *See State v. McFarren*, 62 Wis. 2d 492, 497–98 (1974); *see also* Wis. Stat. § 30.11 (governing the establishment of a bulkhead line).

¶ 30.   Regarding the third element, the test for navigability is whether a body of water is "capable of floating any boat, skiff, or canoe, of the shallowest draft used for recreational purposes."[11] Moreover, a determination that a body of water is navigable does not depend on whether it is always navigable, or whether its navigability is due to natural conditions. As this court held in *DeGayner & Co. v. DNR*, 70 Wis. 2d 936, 946, 236 N.W. 2d 217 (1975), the test is whether the navigability is regularly recurring or of a sufficient duration to make it conducive to recreational uses. Thus, the court in *DeGayner* upheld the DNR's finding that a stream was navigable when periodic high water conditions enhanced by beaver dams led to levels at which a craft could be floated along the stream.

¶ 31.   Based on the stipulated facts and the affidavits submitted, the circuit court determined that the water above the submerged 200-foot section of land was navigable. The circuit court determined that the area around Pete's Point was navigable on a regularly recurring basis for a sufficient duration. In making its determination, the circuit court found relevant the testimony of Mrs. Konkol and another property owner on Lake Killarney, as well as members of the Kelley family, regarding boat travel around Pete's Point. Thus, there appear to be undisputed facts to support the finding that the area in question was navigable.[12]

---

[11] *Muench v. Public Serv. Comm'n*, 261 Wis. 492, 506, 53 N.W.2d 514, 55 N.W. 2d 40 (1952).

[12] The parties do not discuss whether a determination of navigability is a finding of undisputed fact by the circuit court on summary judgment or a conclusion of law.

   The court has treated administrative agency determinations of navigability as findings of fact for purposes of judicial

¶ 32. That leaves the second element, namely, whether the 200-foot section of land is the bed of navigable water subject to state regulation under Wis. Stat. § 30.12(1)(a). The Kelleys contend that if the sole test for a permit is navigability, the State could require an owner to obtain a permit to fill a backyard if the backyard was periodically flooded. Indeed, they contend that this scenario is precisely what occurred in their case: The Kelleys' access roads were regularly flooded, the State assumed jurisdiction, and the State sought to prevent the Kelleys' efforts to repair the roads.

¶ 33. The Kelleys contend that the submerged 200-foot section of land is not a bed of navigable water under Wis. Stat. § 30.12(1)(a), reasoning as follows. According to the Kelleys, just because the water over the 200-foot section of land is navigable does not mean that when submerged their section of land is a bed of navigable water. The Kelleys assert that submerged land cannot be a bed of navigable water if the land is above the ordinary high water mark.[13] The 200-foot section of land upon which the Kelleys deposited the fill in 1988 was, according to the Kelleys, above the then-existing ordinary high water mark. Thus, contend the Kelleys, the 200-foot section of land cannot be the bed of navigable water.

---

review. *See Omernick v. DNR*, 100 Wis. 2d 234, 301 N.W.2d 437 (1981); *Klingeisen v. DNR*, 163 Wis. 2d 921, 472 N.W.2d 603 (Ct. App. 1991).

Although counsel for the Kelleys stated at oral argument that they do not concede navigability, they do not appear to contest it either.

[13] Uplands are lands bordering bodies of water but above the high water mark. *State v. Trudeau*, 139 Wis. 2d 91, 102 n.5, 408 N.W.2d 337 (1987).

¶ 34. The State appears to offer conflicting arguments regarding the proper interpretation of Wis. Stat. § 30.12(1)(a). At times the State argues that the 200-foot section of land in question was below the ordinary high water mark and was part of the bed of Lake Killarney. Thus the State argued to the circuit court on the first day of trial that land that is below the ordinary high water mark is considered a bed of navigable water and that the State intended to prove that the land in question was below the ordinary high water mark.

¶ 35. At other times the State appears to argue that the ordinary high water mark is irrelevant to determining the State's jurisdiction under Wis. Stat. § 30.12(1)(a) to require a permit for depositing fill on the 200-foot section of land. The State seems to contend that it has jurisdiction to regulate the deposit of fill on the 200-foot section of the Kelleys' land, regardless of where the ordinary high water mark is located, because the 200-foot section of land is submerged below navigable water.

¶ 36. In sum, the State has not advanced a coherent legal argument to explain when land such as the 200-foot section at issue in the present case is a bed of navigable water subject to the permit requirements of § 30.12(1)(a).

¶ 37. The dispute in the present case about the interpretation of Wis. Stat. § 30.12(1)(a) seems to turn on whether a finding of navigability eliminates the need to determine whether land is a bed of navigable water, that is, whether the land is below the ordinary high water mark.

¶ 38. The court of appeals in the present case appears to interpret Wis. Stat. § 30.12(1)(a) to mean that navigability is the determinative factor and the determinations of the ordinary high water mark and

the bed are irrelevant once navigability is established. The court of appeals, citing *State v. Trudeau*, 139 Wis. 2d 91, 103–04, 408 N.W.2d 337 (1987), concluded that although the ordinary high water mark determines the bed, it does not necessarily determine navigability.

¶ 39. However, the facts in the *Trudeau* case are different from those in the present case. The issue in *Trudeau* was whether construction could go forward when half the project site was below Lake Superior's ordinary high water mark. The *Trudeau* court concluded that any part of the site below the ordinary high water mark is a protected lakebed upon which building is prohibited.[14] The *Trudeau* court further stated that the water need not be navigable for the land to be lakebed and that lakebed that is below the ordinary high water mark is subject to state regulation under Wis. Stat. § 30.12(1)(a). Citing *Houslet v. Natural Resources Department*, 100 Wis. 2d 280, 287, 329 N.W.2d 219 (Ct. App. 1982), the *Trudeau* court concluded that the public interest in navigable waters such as Lake Superior "extends to areas covered with aquatic vegetation within the ordinary high water mark of the body of water in question."

¶ 40. The issue in *Trudeau* was what are the boundaries of the public trust associated with the lakebed of a natural, navigable lake. The court held that the land below the ordinary high water mark, even though the water over that land was not navigable, is held in trust for the public. The *Trudeau* court did not determine that land over which navigable water sometimes flows is a bed of navigable water for purposes of Wis. Stat. § 30.12(1)(a). Thus, *Trudeau* does not resolve the question in the present case.

---

[14] *Trudeau*, 139 Wis. 2d at 109.

¶ 41. The question in the present case is whether a property owner is required to obtain a permit from the DNR before depositing fill on land submerged below navigable water even though the land may be above the ordinary high water mark. Although case law seems to protect uplands from DNR jurisdiction, the case law does not establish a clear legal answer to the question presented in this case.

¶ 42. Neither the Kelleys nor the State offers authority for their positions. Neither the Kelleys nor the State offers legislative history to aid us in determining the intent of the legislature in interpreting Wis. Stat. § 30.12(1)(a). Neither the Kelleys nor the State discusses the consequences to the public and the administration of chapter 30 should the Court adopt either of their interpretations of Wis. Stat. § 30.12(1)(a).

■

¶ 43. The issue of whether a property owner is required to obtain a permit before depositing fill on land submerged below navigable water regardless of whether the land is above or below the ordinary high water mark is a complex question that affects not only the parties to the present lawsuit but the people of the State of Wisconsin. The precise issue presented in this case has not been sufficiently explored in the briefs or at oral argument to enable us to decide it. Under these circumstances, we are persuaded that, at this stage, this case provides an inappropriate vehicle for resolving the issue this case presents. We therefore considered dismissing this review as improvidently granted. But because the issue is of statewide importance, we take the unusual step of remanding the matter to the circuit court where the parties can

develop the facts and legal analysis to enable the circuit court to address the legal issue presented.

## III

¶ 44. We turn to the Kelleys' constitutional challenges to the State's action. Although their constitutional challenges are not fully developed, the Kelleys appear to focus on two aspects of the case. First, the Kelleys contend that the DNR's failure to properly maintain the dam caused their property to flood and represents an unconstitutional taking. Second, they allege that the five-year delay in bringing this action is unconstitutional.

¶ 45. The Kelleys first raised these constitutional claims in a motion to dismiss that was filed after the circuit court granted summary judgment for the State. The court of appeals concluded that the Kelleys had failed to raise these issues in a timely manner before the circuit court and had therefore waived these constitutional claims. Nonetheless, the court of appeals addressed and rejected the Kelleys' constitutional claims.

¶ 46. Although we agree with the court of appeals that the Kelleys did not raise these constitutional claims in a timely manner and could be deemed to have waived them, we consider these arguments to the extent that the circuit court and court of appeals have also considered them.[15]

¶ 47. As to the Kelleys' first challenge, we agree with the court of appeals that the takings argument made in the Kelleys' briefs is not related to the legal issue that is before this court. The Kelleys' takings

---

[15] *See State v. Gove*, 148 Wis. 2d 936, 940–41, 437 N.W.2d 218 (1989).

argument focuses on the flooding of their roads and timberlands. The issue of whether the Kelleys are entitled to compensation for the flooding of their property has no bearing on the legal issue that is before this court, namely, whether the Kelleys were required to seek a permit before placing fill.

¶ 48.   The sole takings argument that could be relevant to the question before this court is whether chapter 30's requirement that the Kelleys not place fill without a permit constitutes a regulatory taking. The Kelleys' briefs to this court quote *Howell Plaza, Inc. v. State Highway Commission*, 66 Wis. 2d 720, 726, 226 N.W.2d 185 (1975), for the proposition that a regulatory taking occurs "where a restriction had been placed upon the use of land that practically or substantially renders the land useless for all reasonable purposes." Despite reciting this standard, the Kelleys' briefs do not allege that the permit requirement of chapter 30 practically or substantially renders the Kelleys' land useless for all reasonable purposes. We therefore reject the argument that this action represents an unconstitutional taking.

¶ 49.   The Kelleys' second argument that the five-year delay in enforcement is unconstitutional is likewise misplaced in the context of this case. The Kelleys challenge the enforcement delay on two grounds. First, they allege that the possibility of a per-day fine, coupled with a lengthy enforcement delay, could violate due process by leading to a fine that would be excessively high or that would coerce a property owner into forgoing legal rights and acceding to the State's demands.

¶ 50.   We need not consider the Kelleys' speculative arguments regarding the potential problems that might arise from an enforcement delay because these problems are not present under facts of this case. The parties stipulated to a period of 250 days as the basis for calculating the per-day forfeiture, and there is no allegation that the $3,000 forfeiture imposed by the circuit court violates the Kelleys' due process rights. Moreover, the record of this case shows that the Kelleys have decidedly not been coerced into forgoing their legal rights.

¶ 51.   The Kelleys' second basis for challenging the five-year delay is that two potential witnesses for the Kelleys have died since this litigation began. The Kelleys concede that the testimony of these witnesses could have been preserved for litigation. They argue, however, that the possibility that the testimony of these witnesses could have been preserved is not relevant because these deaths were "not scheduled." We cannot conclude that the unforeseen deaths of potential witnesses whose testimony could have been preserved by the parties is a basis for deeming the five-year delay in this case unconstitutional.

IV

¶ 52.   Finally, we address the Kelleys' assertion that they were entitled to summary judgment on the grounds that the water levels in the lake were higher than the dam permit allowed.

¶ 53.   The circuit court rejected this argument, concluding that the dam permit does not set forth mandatory water levels and that therefore the water

levels about which the Kelleys complain do not violate the dam permit.[16]

¶ 54. The relevant language of the dam permit provides that "[t]he dam will be operated with normal head of 11.5 feet and will maintain a pond level at 112.0 feet."[17] The Kelleys contend that this language sets forth a mandatory pond level, and that the flooding of their lands resulted from years of operation at a pond level that was higher than the mandatory 112 feet.

¶ 55. At summary judgment, the State submitted numerous affidavits from DNR officials stating that the permit in issue did not require a pond level of 112 feet. The DNR officials stated that required water levels would appear in the "order" section of the permit rather than in the "findings of fact" section, and would be stated in terms of a maximum and minimum water level.

¶ 56. The Kelleys have offered no factual or legal basis for their reading of the permit language in question. We agree with the circuit court that the dam permit did not require a maximum pond level of 112 feet.

¶ 57. In addition, the circuit court concluded that there were lawful avenues through which the Kelleys could address the issues of water level. According to an affidavit submitted by Sonntag, an engineer with the

---

[16] Alternatively, the circuit court concluded that even if the dam permit required a lower water level, the public may have gained prescriptive rights to a higher water level over the period in which the dam was improperly operated. Because we conclude that the dam permit did not require a lower water level, the parties' arguments regarding prescriptive rights when a permit requires a lower water level are irrelevant.

[17] Findings of Fact, Order, and Permit, Public Service Commission of Wisconsin, April 17, 1955.

DNR, if a dam permit does not set forth maximum and minimum water levels, the DNR may subsequently set water levels if it receives complaints regarding water levels. The Kelleys apparently did not make any complaint regarding the water levels of Lake Killarney before depositing fill without a permit.

■

¶ 58.  We therefore agree with the circuit court that neither the proper maintenance of the dam nor the cause of the water levels on the Kelleys' property are relevant to this action.

¶ 59.  The question on remand to the circuit court is whether the requirements of Wis. Stat. § 30.12(1)(a) have been met so that the Kelleys should have obtained a permit in 1988 before they deposited fill on the 200-foot section of land. More specifically, the question is how to define the "bed," the interplay of the statutory requirements of "bed" and navigable water, and the relevance and location of the ordinary high water mark in 1988. We therefore remand the cause to the circuit court for further proceedings consistent with this opinion.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded to the circuit court.

¶ 60.  ANN WALSH BRADLEY, J., did not participate.

¶ 61.  JON P. WILCOX, J. *(concurring).* I write separately to underscore the fact that on remand, the circuit court should examine the facts at hand in light of *both* Wis. Stat. § 30.12 (1997–98) and Wis. Stat. § 30.15 (1997–98). Contrary to the majority's proviso in footnote 5, the opinion of the court of appeals and both parties' briefs to this court explicitly addressed issues

arising from the circuit court's application of § 30.15. *See, e.g., State v. Kelley*, No. 99–1066, unpublished slip op. at ¶¶ 1, 7, 12, 23, 27 (Wis. Ct. App. Feb. 8, 2000); Respondent's Brief at 9–11, 22–23, 28; Petitioners' Reply Brief at 1.

¶ 62. N. PATRICK CROOKS, J. *(concurring)*. I agree with the majority opinion that a remand is necessary in this case. However, I write separately because the majority opinion has, I believe, stated the primary issue of this case in a confusing manner. In addition, the majority opinion seems to suggest that a dam permit, with minimum and maximum water levels, could not form the basis for a regulatory takings claim.

¶ 63. With respect to the primary issue presented by this case, the majority opinion properly remands this case so that "the parties can develop the facts and legal analysis to enable the circuit court to address the legal issue presented." Majority op. at ¶ 7. There is a lack of evidence in the record with respect to the ordinary high water mark (OHWM) of Lake Killarney in 1988, at the time the Kelleys deposited the fill. In order to address properly the interrelationship between navigability-in-fact and the OHWM, both the parties and the court need information regarding the OHWM.

¶ 64. The preceding sentence leads me to the next point, that the majority opinion has not properly stated the primary issue of this case. Rather than stating the issue in terms of "whether a property owner is required to obtain a permit before depositing fill on land submerged below navigable water regardless of whether the land is above or below the ordinary high water mark," (majority op. at ¶ 7), the issue is better

stated as follows: What is the interrelationship between navigability-in-fact and a body of water's OHWM as these terms pertain to liability under Wis. Stat. §§ 30.12(1)(a), 30.15(1)(a), and 30.15(1)(d)? This is a more fitting statement of the issue because the majority's statement of the issue seems to assume that there was water covering a portion of the road at the time the fill was deposited, even though the parties dispute whether this was the case. Roger Wojner Second Aff. at 1; Paul Kurth Aff. at 1.

¶ 65. Finally, the majority, in holding that the flooding of the Kelleys' roads and timberlands, due to alleged failure of the DNR to maintain the water levels of Lake Killarney as set forth in the dam permit, cannot support a takings claim seems to foreclose a properly proved regulatory takings claim. Majority op. at ¶ 47–48.[1] Under well-established Wisconsin law, a taking of property can occur without physical occupation of land by the government. *Eberle v. Dane Co. Bd. of Adjustment*, 227 Wis. 2d 609, 621, 595 N.W.2d 730 (1999) (citing *Howell Plaza, Inc. v. State Highway Comm'n*, 92 Wis. 2d 74, 81, 87, 284 N.W.2d 887 (1979)). Such a taking is referred to as a regulatory taking. *Eberle*, 227 Wis. 2d at 622. A regulatory taking occurs when a regulation or government action denies " 'the landowner all or substantially all practical uses of a property.' " *Eberle*, 227 Wis. 2d at 622 (quoting *Zealy v. City of Waukesha*, 201 Wis. 2d 365, 374, 548 N.W.2d 528 (1996)). Although I agree with the majority that the information presented in this case does not support a regulatory takings claim, I would not foreclose the

---

[1] It is noted, as set forth in the majority opinion (majority op. at ¶ 45), that the takings issue was first raised in ¶¶ 1 and 5 of the Kelleys' motion for dismissal that was filed after the circuit court granted summary judgment in favor of the State.

possibility that, with proper proof, a party could maintain such a claim. It is possible that the failure to maintain proper water levels, according to a dam permit and order which requires minimum and maximum water levels, could deprive a landowner of all or substantially all practical uses of a piece of property. I write, therefore, to make it clear that we do not foreclose the possibility that the failure to maintain water levels pursuant to such a dam permit and order could form the basis of a valid regulatory takings claim.

¶ 66.    For the foregoing reasons, I respectfully concur.

¶ 67.    I am authorized to state that Justice WILLIAM A. BABLITCH and Justice JON P. WILCOX join this concurrence.