ABKA LIMITED PARTNERSHIP, an Illinois limited partnership, Petitioner-Appellant,†

THE ABBEY HARBOR CONDOMINIUM ASSOCIATION, LTD., a Wisconsin nonprofit corporation, Petitioner-Co-Appellant,†

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES, Geneva Lake Conservancy, Inc., and Oneida County, Respondents-Respondents.

WISCONSIN REALTORS ASSOCIATION, INC., Petitioner-Appellant,†

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES, Respondent-Respondent.†

ABKA LIMITED PARTNERSHIP, an Illinois limited partnership, Petitioner-Appellant,

The ABBEY HARBOR CONDOMINIUM ASSOCIATION, LTD., a Wisconsin nonprofit corporation, Petitioner-Co-Appellant,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES, Respondent-Respondent.

---

† Petition to review granted 12-17-01.

WISCONSIN ASSOCIATION OF LAKES, INC., Petitioner-Appellant,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES, Respondent-Respondent.

WISCONSIN REALTORS ASSOCIATION, INC., Petitioner-Appellant,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES, Respondent-Respondent.

Court of Appeals

*No. 99–2306. Oral argument May 1, 2001.—Decided August 22, 2001.*

2001 WI App 223

(Also reported in 635 N.W.2d 168.)

On behalf of the petitioner-appellant ABKA Limited Partnership and the petitioner-co-appellant The Abbey Harbor Condominium Association, Ltd., there were joint briefs by *Anthony S. Earl, Waltraud A. Arts* and

Brian W. Blanchard of *Quarles & Brady, LLP* of Madison; *Alan Marcuvitz* of *Weiss, Berzowski, Brady & Donahue, LLP* of Milwaukee; *Lisle W. Blackbourn* of *Godfrey, Neshek, Worth, Leibsle & Conover, S.C.* of Elkhorn; and *Thomas L. Shriner, Jr.* of *Foley & Lardner* of Milwaukee. There were oral arguments by *Thomas L. Shriner, Jr.*

On behalf of the petitioner-appellant Wisconsin Realtors Association, Inc., there were briefs by *Winston A. Ostrow* and *Donald L. Romundson* of *Godfrey & Kahn, S.C.* of Green Bay. There were oral arguments by *Donald L. Romundson.*

On behalf of the petitioner-appellant Wisconsin Association of Lakes, Inc., there were briefs by *William P. O'Connor* and *Mary Beth Peranteau* of *Wheeler, Van Sickle & Anderson, S.C.* of Madison. There were oral arguments by *William P. O'Connor.*

On behalf of the respondent-respondent Wisconsin Department of Natural Resources, there was a brief by *John S. Greene*, assistant attorney general, and *James E. Doyle*, attorney general. There were oral arguments by *John S. Greene.*

On behalf of the respondent-respondent Geneva Lake Conservancy, Inc., there was a brief and oral arguments by *Peter B. King* of *Peter B. King, Attorney at Law, S.C.* of Fontana.

On behalf of the respondent-respondent Oneida County, there were briefs and oral arguments by *Lawrence R. Heath*, corporation counsel.

Before Nettesheim, P.J., Brown and Snyder, JJ.

¶ 1. SNYDER, J. This case is the result of five separate cases consolidated before the circuit court. ABKA Limited Partnership (ABKA) and The Abbey

Harbor Condominium Association, Ltd. (the Association) appeal from a circuit court order denying their joint petition for review of an administrative law judge's (ALJ) decision regarding their WIS. STAT. ch. 30 (1999–2000)[1] permit application to the Wisconsin Department of Natural Resources (DNR). ABKA owned a public marina and sought to convert ownership of all 407 boat slips to a condominium-style ownership called "dockominiums." The ALJ expressly limited the number of boat slips that ABKA can convert to dockominiums. ABKA and the Association challenge the DNR's jurisdiction to require a new permit and to limit the number of dockominiums in the Marina. In addition, ABKA and the Association argue that the ALJ's decision to limit the number of dockominiums is arbitrary and unsupported by record evidence.

¶ 2. The Wisconsin Realtors Association, Inc. (WRA) also appeals the circuit court's order, arguing that the DNR's guidances, used by the DNR to arrive at the appropriate number of dockominiums, are illegal attempts to circumvent the rule-making requirements of WIS. STAT. ch. 227, that WIS. ADMIN. CODE § NR 326.04(8) is invalid, that the change in ownership to condominium-style ownership is allowed, and that the DNR did not have the authority to require a new WIS. STAT. § 30.12 permit.

¶ 3. In addition, the Wisconsin Association of Lakes, Inc. (WAL) appeals the circuit court's order. In contrast to ABKA and WRA, WAL argues that ABKA's dockominium development violates the public trust doctrine by purporting to convey a perpetual exclusive

---

[1] All statutory references are to the 1999–2000 version unless otherwise noted.

right to a portion of Lake Geneva, exceeds reasonable riparian rights, and violates the provisions of Wis. Stat. § 30.133.

¶ 4. We agree with WAL that the dockominium development proposed by ABKA and the Association violates the public trust doctrine.

## FACTS

¶ 5. In 1994, ABKA was the owner of the Abbey at Fontana at Lake Geneva; the Abbey Harbor (the Harbor) was created by the dredging of Potawatomi Creek pursuant to a permit issued in July 1962 by the Wisconsin Public Service Commission. When issuing this permit, the PSC also authorized the construction of the first 200 boat slips of what would eventually become the 407–slip Marina. Additional permits were later issued, the most recent issued in 1987 for the construction of additional piers and slips in the Harbor.

¶ 6. The Harbor consists of a man-made basin with 407 boat slips, a swimming pool, a parking area, and a Harbor House. The Marina's 407 boat slips were rented to boat owners on an annual basis with the option to renew. In late 1994, ABKA, the private owner of the Marina, decided to convert the Marina to a condominium form of ownership and began preparation of a condominium declaration. ABKA's proposal did not change the number, size or configuration of any structure in the Marina, but simply changed the ownership to condominium style. During these preparations, the DNR contacted ABKA and asked to review the language of the proposed condominium declaration.

¶ 7. After reviewing the language of the proposed condominium declaration, the DNR insisted upon language changes in the declaration. The DNR approved

the revised language changes of the Abbey Harbor Condominium Declaration (Declaration), which was filed on February 28, 1995.

¶ 8. Under the revised terms of the Declaration, each unit is separately owned property held in fee simple title by the unit owner. A dockominium unit is defined as a cubicle of space in a lock-box located within a building known as the Harbor House at the Marina. Each unit/lock-box has a number which corresponds to an existing boat slip at the Marina. Each unit owner has the right to use the space beside the pier or piers corresponding to the unit number.

¶ 9. In addition to the independent ownership of each unit, the unit owners own, as tenants in common with each other, all of the common elements of the condominium, including all of the real estate, the Harbor House, the parking lots, all docks and piers, and the swimming pool. A unit owner is entitled to freely sell, lease, sublease, rent or license the unit, and is required to keep the structures adjacent to the unit in good repair.

¶ 10. Under the terms of the Declaration, each unit owner is required to be a member of the Association, which is responsible for the maintenance, repair and replacement of all common elements, dredging the Harbor and landscaping. The Declaration also endows the Association with the authority to enforce compliance with its terms and to assess unit owners for the costs associated with the operation, maintenance and repair of the Marina.

¶ 11. After the language of the Declaration was changed, the DNR maintained that ABKA had to apply for a new Wis. Stat. § 30.12 permit to convert the Marina to condominium ownership. The DNR maintained that under § 30.12, a certain number of boat

slips needed to be withheld from sale and set aside for seasonal rental to the public. While ABKA challenged the DNR's authority to require both a new permit and a certain number of set-asides, on March 13, 1995, ABKA filed an application for a new § 30.12 permit, requesting authorization for the conveyance of 407 boat slips to private owners under a condominium form of ownership and reserving the right to challenge the DNR's jurisdiction in this matter. The Association was subsequently made a co-applicant in the proceedings. On April 5, 1995, Geneva Lake Conservancy, Inc. (Geneva Lake) objected to the permit application, which was then referred to the Division of Hearings and Appeals for a contested case hearing. Pending a hearing on the permit application, the DNR and ABKA reached an agreement that ABKA could file the Declaration; that the current structures at the Marina were validly permitted; that a contested case hearing would determine how many boat slips, if any, needed to be set aside; and that ABKA could begin selling up to 282 units, setting aside at least 125 units until a hearing decision was rendered.

¶ 12. On November 13–17 and December 18, 1995, a contested case hearing was held before an ALJ regarding ABKA and the Association's permit application. Geneva Lake, WRA, WAL and Oneida County (Oneida) fully participated in the contested case hearing as intervening parties; WRA was in support of the condominium project, while Geneva Lake, WAL and Oneida were opposed. On July 29, 1996, the ALJ issued his decision, finding that the DNR did have jurisdiction to require a new WIS. STAT. § 30.12 permit, and that 287 of the 407 slips at the Marina must be set aside for seasonal rental.

¶ 13. On August 23, 1996, ABKA filed a petition for judicial review of the ALJ's decision in both Walworth county and Dane county. WRA also filed a petition for judicial review in Walworth and Dane counties. WAL then filed a petition for review of the ALJ's decision in Dane county. By stipulation, on October 14, 1996, the Walworth County Circuit Court entered an order transferring the Dane county cases to Walworth county and consolidating all of the above actions.[2]

¶ 14. After briefing and oral argument, on June 4, 1999, the circuit court issued a decision affirming the ALJ's decision and entered a final order denying the petitions for review on June 24, 1999. ABKA, the Association, WRA and WAL filed notices of appeal. Geneva Lake and Oneida filed separate petitions to intervene. On October 19, 1999, ABKA filed a motion, with all parties agreeing to said motion, to consolidate the above appeals. We determined that consolidation of the above actions was unnecessary because the cases were consolidated in the circuit court and were resolved in a single circuit court order; thus, the notices of appeal of the various appellants gave rise to a single appeal proceeding. Furthermore, we denied Oneida's and Geneva Lake's petitions to intervene. However, we held that because they were parties in the circuit court, and were adverse to some or all of the appellants, they were respondents who could defend the circuit court's order against challenges made to it by the appellants.

---

[2] In addition, in October 1996, DFS Development, Inc., Charles E. Eklund and Chicago Title Insurance Company filed in the circuit court a proposed petition for judicial review by applicants for intervention as party petitioners. This motion to intervene was denied by the circuit court on December 12, 1996; we ultimately affirmed this denial on December 10, 1997.

¶ 15. On September 20, 2000, we certified this matter to the Wisconsin Supreme Court, as the matters at issue are ones of first impression and represent important public policy questions regarding riparian rights and the public trust doctrine. We certified as to one issue: Is a dockominium development, based upon condominium real estate law, that limits public access to navigable waters in favor of private riparian ownership a violation of the Wisconsin public trust doctrine and WIS. STAT. ch. 30? After our request for certification, ABKA filed a motion for leave to file a supplemental brief. The Wisconsin Supreme Court accepted certification on October 19, 2000.

¶ 16. On November 13, 2000, ABKA and the Association filed a motion to clarify the scope of the issues certified. Following all parties' numerous and varied responses to ABKA and the Association's motion, the Wisconsin Supreme Court rescinded and withdrew its order accepting certification, and this matter was returned to us.

## STANDARD OF REVIEW

¶ 17. This case involves an appeal from a circuit court order affirming the decision of an administrative agency. In an appeal from such an order, we review the decision of the agency, not the circuit court. *Sea View Estates Beach Club, Inc. v. DNR*, 223 Wis. 2d 138, 145, 588 N.W.2d 667 (Ct. App. 1998). Review of an agency's decision is confined to the record. *Sterlingworth Condo. Ass'n, Inc. v. DNR*, 205 Wis. 2d 710, 720, 556 N.W.2d 791 (Ct. App. 1996).

¶ 18. A different standard of review for agency decisions is applied for questions of law and questions

of fact. *Sea View Estates*, 223 Wis. 2d at 148. If presented with a question of fact, we employ the "substantial evidence" standard. *Id*. Substantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. *Id*. If the issue presents a question of law, we must set aside or modify the agency action if we find that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or we shall remand the case to the agency for further action under a correct interpretation of the provision of law. *Id*. To this end, we apply one of three levels of deference to the conclusion of the agency: "great weight," "due weight" or "de novo." *Id*.

■■■

¶ 19. An agency's interpretation or application of a statute may be accorded great weight deference, due weight deference or de novo review, depending on the circumstances. *UFE Inc. v. LIRC*, 201 Wis. 2d 274, 284, 548 N.W.2d 57 (1996). We accord great weight deference only when all four of the following requirements are met: the agency was charged by the legislature with the duty of administering the statute; the interpretation of the agency is one of long standing; the agency employed its expertise or specialized knowledge in forming the interpretation; and the agency's interpretation will provide uniformity and consistency in the application of the statute. *Id*. Under the great weight standard, we will uphold an agency's reasonable interpretation that is not contrary to the clear meaning of the statute, even if we determine that an alternative interpretation is more reasonable. *Id*. at 287.

■■■

¶ 20. We will accord due weight deference when "the agency has some experience in an area, but has not

developed the expertise which necessarily places it in a better position to make judgments regarding the interpretation of the statute than a court." *Id.* at 286. The deference allowed an administrative agency under due weight review is accorded largely because the legislature has charged the agency with the enforcement of the statute in question. *Id.* Under this standard, we will not overturn a reasonable agency decision that furthers the purpose of the statute unless we determine that there is a more reasonable interpretation under the applicable facts than that made by the agency. *Id.* at 286–87. Finally, we will employ de novo review when the legal conclusion reached by the agency is one of first impression or when the agency's position on the statute has been so inconsistent as to provide no real guidance. *Id.* at 285.

¶ 21. While Oneida argues that the DNR's decision should be accorded great weight, ABKA, the Association, WRA, WAL, the DNR and Geneva Lake all maintain that the agency's decision should be accorded no weight and should be reviewed de novo. The agency's decision does not meet the "great weight" standard; although the legislature has charged the DNR with the duty of enforcing environmental laws, including the regulation of piers in navigable water, *Sea View Estates*, 223 Wis. 2d at 149, the issue of a public marina's conversion to private property and condominium ownership is an issue of first impression. This also precludes "due weight" deference, and thus de novo review is required.

## PRINCIPLES OF PROPERTY OWNERSHIP, REAL AND RIPARIAN

¶ 22. The instant issue involves the conversion of real riparian property, a marina privately owned by a limited partnership, to another form of private property ownership. Identification and definition of the pertinent legal terms and doctrines is necessary for a thorough understanding of the issues.

¶ 23. In 1995, ABKA privately owned the 407–slip Marina. A "marina" is defined as "[a] boat basin that has docks, moorings, supplies, and other facilities for small boats." AMERICAN HERITAGE DICTIONARY 766 (2d College ed. 1982). The ownership of land has often been referred to as a "bundle of rights." *State ex rel. Wis. Edison Corp. v. Robertson*, 99 Wis. 2d 561, 569, 299 N.W.2d 626 (Ct. App. 1980). This "bundle of rights" real property theory asserts that the owner has the right to enter it, use it, sell it, lease it, or give it away, as he or she so chooses. *Id.* at 569 n.11. These rights are guaranteed by law but are also subject to certain governmental and private restrictions. *Id.*

¶ 24. The Marina, because it borders Lake Geneva, is also riparian property, and thus ABKA is a riparian owner. Riparian owners are those who have title to the ownership of land on the bank of a body of water. *Ellingsworth v. Swiggum*, 195 Wis. 2d 142, 148, 536 N.W.2d 112 (Ct. App. 1995). A riparian owner is accorded certain rights based upon title to the ownership of shorefront property. *Sea View Estates*, 223 Wis. 2d at 157. These rights are well defined and include the right to use the shoreline and have access to the waters, the right to reasonable use of the waters for domestic,

agricultural and recreational purposes, and the right to construct a pier or similar structure in aid of navigation. *Id.* A riparian owner is entitled to exclusive possession to the extent necessary to reach navigable water and to have reasonable access for bathing and swimming. *Id.*

■■

¶ 25. In February 1995, ABKA filed a condominium Declaration to convert and sell the Marina boat slips to private owners as "dockominium" units; this dockominium scheme is, in essence, a condominium type of ownership of the Marina. Dockominium projects are typically premised on condominium law because a dockominium is similar to a condominium in that both involve the division and co-ownership of an asset previously owned by a single entity. Karin J. Wagner, *Geneva Lake Dockominiums: An Exercise of Riparian Rights in Violation of the Public Trust Doctrine,* 4 WIS. ENVTL. L.J. 243, 245 (Summer 1997).

¶ 26. "Condominium" is defined as "property subject to a condominium declaration established under this chapter." WIS. STAT. § 703.02(4). A "declaration" is defined as "the instrument by which a property becomes subject to this chapter, and that declaration as amended from time to time," § 703.02(8), and must contain all of the elements set forth at WIS. STAT. § 703.09. A condominium "unit" is defined as

> a part of a condominium intended for any type of independent use, including one or more cubicles of air at one or more levels of space or one or more rooms or enclosed spaces located on one or more floors, or parts thereof, in a building. A unit may include 2 or more noncontiguous areas.

Section 703.02(15). The "common elements" of a condominium are defined as "all of a condominium except its

units," § 703.02(2), while the "limited common elements" are defined as "those common elements identified in a declaration or on a condominium plat as reserved for the exclusive use of one or more but less than all of the unit owners." Sec. 703.02(10).

¶ 27. No similar statutory definition for "dockominium" exists. While a dockominium can be considered, from the mere origin of its name, a condominium-style marina, a dockominium has been more precisely defined as a "dockside community of privately owned boats moored in slips that are purchased for year-round living. . . . A slip in such a community." AMERICAN HERITAGE DICTIONARY (4th ed. 2000) at http://www.bartleby.com/61/53/D0315300.html. A "slip" is defined as a "docking place for a ship between two piers." *Id.* at http://www.bartleby.com/61/54/S0475400.html.

¶ 28. Here, under the Declaration, a dockominium unit consists of

> that separate area of the condominium intended for independent, private use, comprised of a cubicle of space defined by a "Lock Box" located within the Harbor House. . . . Each unit shall include as an appurtenance,[3] standard riparian rights of owners of waterfront real estate under Wisconsin Law, and the use of an assigned boat slip corresponding to the unit designation as a part of the common elements. . . .

The Declaration also states that the common elements do not include the above-described individual units, but "[e]ach unit owner, as a limited common element appur-

---

[3] An "appurtenance" is defined as "[s]omething that belongs or is attached to something else." BLACK'S LAW DICTIONARY 98 (7th ed. 1999).

tenant exclusively to his unit, shall have riparian rights to use of the space beside the pier or piers corresponding to his unit number . . . for use as a boat slip." Each unit owner has a fee simple interest in his or her dockominium unit, and an undivided interest in the common elements and facilities and limited common elements as a tenant in common with all other unit owners. A fee simple interest means "[a]n interest in land that, being the broadest property interest allowed by law, endures until the current holder dies without heirs . . ." BLACK'S LAW DICTIONARY 630 (7th ed. 1999). "Tenancy in common" is defined as "[a] tenancy by two or more persons, in equal or unequal undivided shares, each person having an equal right to possess the whole property but no right of survivorship." *Id.* at 1478.

¶ 29. While riparian owners such as ABKA have certain well-established rights that are incidents of their ownership of property adjacent to the water, under the public trust doctrine, these rights are subject to the public's right to use navigable waters. *State v. Bleck*, 114 Wis. 2d 454, 469, 338 N.W.2d 492 (1983). The public trust doctrine has its roots in article IX, section 1 of the Wisconsin Constitution, under which the state holds the beds of navigable waters in trust for public use.[4] *Borsellino v. DNR*, 232 Wis. 2d 430, 443, 606 N.W.2d 255 (Ct. App. 1999). The regulation and enforcement of this public trust rests with the legislature and the DNR. *Id.*

---

[4] In fact, the public trust doctrine precedes our state constitution. *Borsellino v. DNR*, 232 Wis. 2d 430, 443 n.6, 606 N.W.2d 255 (Ct. App. 1999), citing to article IV of the Northwest Ordinance of 1787.

¶ 30. Although the public trust doctrine was originally designed to protect commercial navigation, it has been expanded to protect the public's use of navigable waters for purely recreational and nonmonetary purposes. *Bleck*, 114 Wis. 2d at 465. Public policy factors signifying the public interest include the wish to preserve the natural beauty of our navigable waters, to obtain the fullest public use of these waters, including but not limited to navigation, and to provide for the convenience of riparian owners. *Sea View Estates*, 223 Wis. 2d at 159. Such public interest concerns also include maintaining the safe and healthful condition of the water, protecting spawning grounds and aquatic life, controlling the placement of structures and land uses, preserving shore cover and natural beauty, and promoting the general attractiveness and character of the community environment. *Id.* at 160.

¶ 31. The common law also requires reasonable use by riparian owners. *Sterlingworth*, 205 Wis. 2d at 731. "[E]very . . . right which a riparian owner acquires, as such, to the waters . . . by his land, is restricted always to that which is a . . . reasonable use, and these terms are to be measured and determined by the extent and capacity of the [lake], the uses to which it has been put, and the rights that other riparian owners on the same [lake] also have." *Id.* (citation omitted).

¶ 32. The legislature has charged the DNR with the duty of enforcing environmental laws, including the regulation of piers in navigable waters pursuant to WIS. STAT. §§ 30.12 and 30.13. Both § 30.12 and WIS. STAT. ch. 30 generally codify a number of common law doc-

trines regarding the ownership of the beds of navigable waters. *State v. Trudeau*, 139 Wis. 2d 91, 101, 408 N.W.2d 337 (1987). Section 30.12 is a codification of the common law restriction against encroachments on publicly held lake beds, *Trudeau*, 139 Wis. 2d at 102, and its function is to regulate the placement of fill or structures on the beds of navigable waters, but not to regulate the use and enjoyment of those waters. *Bleck*, 114 Wis. 2d at 467. Section 30.12 is a rational way of accommodating both the public trust doctrine and the reasonable use doctrine, as it "recognizes the tradition of certain rights unique to riparian owners, yet ensures that riparians will not be able to place structures on the beds of navigable waters if they are detrimental to the paramount public interest." *Bleck*, 114 Wis. 2d at 469–70. A § 30.12 permit will not be authorized if the structure proposed by the riparian owner materially obstructs navigation or if the structure infringes upon the public interest. *Bleck*, 114 Wis. 2d at 469.

¶ 33. The Wisconsin Supreme Court has stated that

> [t]he title to the beds of all lakes and ponds, and of rivers navigable in fact as well, *up to the* line of ordinary high-water mark, within the boundaries of the state, became vested in it at the instant of its admission into the Union, in trust to hold the same so as to preserve to the people forever the enjoyment of the waters of such lakes, ponds, and rivers, to the same extent that the public are entitled to enjoy tidal waters at the common law.

*Trudeau*, 139 Wis. 2d at 101 (citation omitted).

## DISCUSSION

*Jurisdiction of the DNR*

¶ 34. ABKA[5] first argues that the DNR lacked jurisdiction to require it and the Association to apply for a new Wis. Stat. § 30.12 permit. Specifically, ABKA argues that § 30.12 does not provide a valid basis for the DNR to review its existing permit.

¶ 35. ABKA and the DNR reached an agreement wherein ABKA agreed to apply for a new permit, but reserved the right to contest the DNR's jurisdiction. However, as both this agreement and the ALJ noted, we are not bound by this understanding. In addition, while the ALJ provided a thorough and well-reasoned analysis of the reach of Wis. Stat. § 30.12 and the DNR's authority, we hold that ABKA waived this argument by applying for the new permit in the first place.

¶ 36. The application filed by ABKA specifically states that the application is filed pursuant to Wis. Stat. ch. 30. While ABKA asserts in the application that "the DNR has no jurisdiction to require a review or modification of" the permit, and that ABKA was not "waiving or limiting its rights to contest" the DNR's jurisdiction, by applying for the permit it willingly placed itself under the DNR's jurisdiction and the reach of ch. 30. ABKA may have filed the application under protest, but the DNR did not force it to file the application. ABKA could have refused to file the application and risked an enforcement proceeding or the imposition of fines and penalties, wherein it could have challenged the DNR's authority. *See Sterlingworth*, 205 Wis. 2d at 726–27. Furthermore, ABKA could have filed a declaratory

---

[5] ABKA submitted briefs and provided oral arguments on both its and the Association's behalf.

817

judgment action in circuit court under WIS. STAT. § 227.40, asking a circuit court to determine its rights and obligations under WIS. STAT. § 30.12. Instead, it chose to file a ch. 30 permit application. As both the agreement and the ALJ noted, any reliance on the agreement was the result of a calculated business gamble by ABKA, done at ABKA's own risk. As applicants, ABKA and the Association placed themselves under the DNR's jurisdiction, thereby foreclosing the argument that the DNR had no jurisdiction over this project.

*Public Trust Doctrine*

¶ 37. WAL argues that ABKA's dockominium development violates the public trust doctrine by attempting to convey a perpetual exclusive right to a portion of Lake Geneva.

¶ 38. We pause to commend the ALJ for the careful, extensive and professional analysis that resulted in the agency decision under review. As the ALJ noted in his comprehensive and in-depth analysis, this is a matter of first impression in Wisconsin and the law is silent on the issue of whether the dockominium form of ownership is permissible under the public trust doctrine. It is clear that the dockominium concept represents a confrontation between a private claim in boat slip space and public interests in the water. Mark Cheung, *Dockominiums: An Expansion of Riparian Rights that Violates the Public Trust Doctrine,* 16 B.C. ENVTL. AFF. L. REV. 821, 825 (Summer 1989).

¶ 39. The United States Supreme Court's seminal decision on the public trust doctrine held that the state is directed to act as trustee of the waters within its

borders and to protect the public's right to use the waters. *Illinois Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 435 (1892). The public trust doctrine is premised on the idea that private ownership of public resources is improper and provides the public with a right to the benefit of certain public resources. Cheung, *supra,* at 830–31. This right supplants any private interests and imposes strict responsibilities upon the government as trustee of these public resources. *Id.* The government cannot relinquish its trust duties associated with any public property. *Id.* at 831.

¶ 40. Regulation of private riparian uses is essential if the state is to fulfill its role of protecting state waters. Wagner, *supra,* at 247. When conflicts occur over the use of the waters of the state, riparian rights must always surrender to the public interest. *Id.* at 248. Wisconsin has repeatedly acknowledged its obligation to safeguard the state's navigable water resources for the use, enjoyment and benefit of the public. *Id.* at 247.

¶ 41. Here, section 5 of the Declaration provides definitions and a description of the units; a dockominium unit is

> that separate area of the condominium intended for independent, private use, comprised of a cubicle of space defined by a "Lock Box" located within the Harbor House as shown in the Condominium Plat . . . Each unit shall include as an appurtenance, standard riparian rights of owners of waterfront real estate under Wisconsin Law, and the use of an assigned boat slip corresponding to the unit designation as a part of the common elements of **THE ABBEY HARBOR CONDOMINIUM**.

According to the Declaration, the common elements and facilities consist of the real property, and real

property interests, improvements and appurtenances described in this Declaration, except the above-described individual units; the common elements and facilities

shall include, without limitation, the land and real property interests described . . . herein including the buildings and improvements located thereon, the marina shoreline, sea wall and sidewalk along said shoreline . . . all docks, boardwalks, piers and pilings contained within the marina, all as shown on the Condominium Plat . . . the Harbor House, outdoor swimming pool, boat launching ramp, sidewalks, driveways and walkways, utility services, utility lines and conduits including those leading up to the utility pedestal boxes serving the respective boat slips, parking areas within the condominium Property, and those improvements, structures and facilities shown on the Condominium Plat as well as certain "Dock Boxes" located on the condominium Property, but not shown on the Condominium Plat, and any and all other parts or elements of the condominium Property as described in this Declaration and additions thereto in the future made by the unit owners or the Association of Unit Owners (hereinafter described).

The limited common elements include the boat slips:

Each unit owner, as a limited common element appurtenant exclusively to his unit, shall have riparian rights to use of the space beside the pier or piers corresponding to his unit number as shown in the Condominium Plat, for use as a boat slip. . . . The placement of riparian structures in, and the use of, the waters of the marina as a part of **THE ABBEY HARBOR CONDOMINIUM** is subject to the rights of the members of the public and the State of Wisconsin under Wisconsin law and subject to permits issued by the State of Wisconsin.

¶ 42. Each unit owner owns a fee simple interest in his or her condominium unit and an undivided interest in the common elements and facilities and limited common elements as a tenant in common with all other unit owners. Unit owners can sell, lease, sublease, rent, license or otherwise contract for the usage of their respective boat slip, without restriction, subject to state permits, on a long-term or short-term basis, in their sole discretion. Individual unit owners are required to maintain or provide all necessary insurance for their unit and its appurtenance.

¶ 43. Technically, the conveyance of the dockominium unit as defined by the Declaration fulfills the requirements of Wisconsin's condominium law because the unit is intended for independent use and is an enclosed space located within a building, a lock-box in the Harbor House. Wagner, *supra,* at 251. However, unlike most condominium units, the lock-box itself has no inherent value; rather, the appurtenant rights attached to the conveyance are the valuable commodity. *Id.* We agree with the ALJ that, to some degree, "the dockominium concept involves a legal fiction: that ABKA is selling the lock-box condominium units, rather than the pier slips."

¶ 44. By definition, a "dockominium" is a "dockside community of privately owned boats moored in slips that are purchased for year-round living. . . . A slip in such a community." AMERICAN HERITAGE DICTIONARY (4th ed. 2000) at http://www.bartleby.com/61/53/D0315300.html. Here, while a dockominium unit is labeled a lock-box, appurtenant to the lock-box is the exclusive use of an assigned boat slip as part of the common elements. As a common element, the boat slip is conveyed to the unit owners and the Association as tenants in common.

But a boat "slip" is, by definition, a "docking place for a ship between two piers." *Id.* at http://www.bartleby.com/61/54/S0475400.html. In other words, *a boat slip is the water and the lake bed under the water.* Thus, ABKA is attempting to convey a portion of the waters of Lake Geneva to the unit owners as tenants in common. The ALJ's decision acknowledges that under the Declaration, the "pier slip is [the individual owner's] and cannot be considered to provide a public benefit." The public trust doctrine should not be manipulated to allow a conveyance of interest in the water as tenants in common. Cheung, *supra,* at 852.

¶ 45. An examination of existing literature on dockominiums confirms this conclusion. A dockominium does not adversely impact water quality, quantity or flow, but despite the dockominium's creative manipulation of riparian rights, it does obstruct the public's complete access to the waterways and creates a claim of private ownership upon water owned by the public. *Id.* at 825. In fact, the dockominium concept is founded on the idea that individuals may own exclusive control of the water within a boat slip space. *Id.* at 822.

¶ 46. Dockominium purchasers become riparian owners of the individual parcels of riparian rights and understandably expect that no other boater, or even a swimmer, can occupy the slip space. *Id.* at 844. This expectation suggests that the dockominium owner owns the water within the slip space. *Id.* As the ALJ noted, the use of the waters of Abbey Harbor, including the waters in the boat slips, is legally open to members of the public. However, the ALJ also acknowledged that "there is an inherent conflict between the public's use of these waters and the expectations of an exclusive property interest in the pier slips."

¶ 47. ABKA's marketing materials do nothing to dispel that expectation. One advertisement purporting to explain the dockominium program addresses the purchase price of a slip and the advantages of owning a slip versus renting one. This advertisement asserts that a dockominium can be sold, transferred or passed by inheritance at any time. ABKA and the Association advised prospective buyers to "look into a permanent berth" at the Marina and stated that "individual slips can be owned and transferred by deed." The ALJ commented that without question the initial marketing of the dockominiums "sought to blatantly sell public waters for private benefit." As the ALJ noted, the marketing language was less blatant in more recent versions; however, "dockominium purchasers may still believe they are purchasing permanent rights in public waters as a result of the purchase of a . . . unit."

¶ 48. ABKA argued before the ALJ that a dockominium conveyance is consistent with the public trust doctrine because the language in the Declaration continues to subject dockominium slip holders to state regulation. However, we agree with the ALJ that "[m]arketing of the pier slips . . . could give unit owners a false expectation of a property interest in public waters" and that any restrictions "could be rendered meaningless once the expectation of a property interest has been established."[6]

¶ 49. Despite the use of the restrictive language in the Declaration, approval of ABKA's application would

---

[6] A recent United States Supreme Court opinion lends weight to this expectation. *Palazzolo v. Rhode Island*, 533 U.S. 606, 121 S. Ct. 2448 (2001), could have an impact on whether a purchaser of a dockominium would have a future takings action against the state if his or her riparian real estate interest in a boat slip were later challenged.

Palazzolo was a shareholder in a corporation that purchased a waterfront parcel in 1959, most of which is salt marsh subject to tidal flooding. *Id.* at 2455. In 1971, Rhode Island created an agency (Council) to protect coastal wetlands that included this wetland parcel. *Id.* at 2456. In 1978, Palazzolo obtained sole ownership of the parcel after the corporation terminated. *Id.* In 1983, Palazzolo asked permission to construct a wooden bulkhead and to fill in the entire marshland area. *Id.* Council denied this request. *Id.* In 1985, Palazzolo asked permission to fill in eleven of eighteen wetland acres to build a private beach club. *Id.* Council denied this request on the basis that no compelling public purpose would be served. *Id.* Palazzolo filed an inverse condemnation action, arguing that the wetlands regulation had taken his property without compensation even though the regulation had existed at the time he became the sole owner. *Id.*

In effect, *Palazzolo* indicates that a buyer's acquisition of title, even after regulatory rules become effective, does not bar a takings claim:

> Were we to accept the State's rule, the postenactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable. A State would be allowed, in effect, to put an expiration date on the Takings Clause. This ought not to be the rule. Future generations, too, have a right to challenge unreasonable limitations on the use and value of land.

> Nor does the justification of notice take into account the effect on owners at the time of enactment, who are prejudiced as well. Should an owner attempt to challenge a new regulation, but not survive the process of ripening his or her claim . . . under the proposed rule the right to compensation may not be asserted by an heir or successor, and so may not be asserted at all. The State's rule would work a critical alteration to the nature of property, as the newly regulated landowner is stripped of the ability to transfer the interest which was possessed prior to the regulation. The State may not by this means secure a windfall for itself . . . . The Takings Clause is not so quixotic. A blanket rule that purchasers with

824

would gain vested private rights in public waters. ABKA's plan purports to create permanent rights in an area of public water. The ALJ aptly stated that "[c]onversion of all 407 slips to dockominium status would violate long-held notions of the reasonable use of public trust waters by a riparian." We fail to see how the conveyance of 407 separate private property interests in public waters is violative of the public trust doctrine, but the conveyance of 120 separate private property interests in public waters is not. Put simply, the conveyance of 7 or the conveyance of 407 boat slips in the manner proposed by ABKA violates the public trust doctrine.

¶ 50. In essence, a dockominium development attempts to offer a small class of boat owners the exclusive and permanent right to own and to occupy a portion of public trust waters and provides access to the waters to a select group of the public, which fails to satisfy the purpose of the public trust doctrine. Catherine Robinson Hall, *Dockominiums: In Conflict with*

notice have no compensation right when a claim becomes ripe is too blunt an instrument to accord with the duty to compensate for what is taken.

*Id.* at 2462–63.

*Palazzolo* suggests that a dockominium owner would have a ripened takings claim in the future if the state, exercising its public trust doctrine responsibility, ever tried to interfere with the owner's entitlement to the appurtenant pier and boat slip.

However, none of the parties in the case at hand have had a chance to address *Palazzolo* and develop arguments regarding its issues; thus, we do not rely on *Palazzolo* in making our decision. We mention it only for its potential implications in cases such as this.

*the Public Trust Doctrine,* 24 SUFFOLK U. L. REV. 331, 343 (Summer 1990). A dockominium removes a portion of the public trust area from free availability for the citizens, which directly conflicts with the underpinning and careful limitations of the public trust doctrine. *Id.* Exclusive private ownership of water is completely contrary to the foundation of the public trust doctrine. *Id.*

¶ 51. The DNR may allow individuals to place docks in the water for access and reasonable use of the water by issuing permits but may not allow the passing of title to the water. Cheung, *supra,* at 852. Navigable waters unquestionably belong to the people, and to allow private individuals to claim the dockominium slip space or the water within the slip as a property interest is violative of the public trust doctrine. *Id.* By permitting the conversion of marinas to private dockominiums as ABKA proposed here, the DNR has allowed control over public trust lands to be vested in private individuals, in violation of the public trust doctrine.[7]

## CONCLUSION

¶ 52. A boat slip is by definition the water and lake bed between two piers; no one but the state can own the water and the lake bed. Riparian owners do not possess water in a lake, but only the right to reasonable use of the water in the lake; "[r]iparian owners acquire at most the usufructuary right to water based on possession or dominion, but not outright ownership of the water." *Id.* at 839.

---

[7] Because our resolution of this issue disposes of the appeal, we need not address the remaining arguments. *Sweet v. Berge,* 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983).

¶ 53. ABKA's dockominium proposal allows ABKA and the Association to transfer ownership of public waters to private individuals and therefore is in direct conflict with the public trust doctrine. We therefore reverse the order of the circuit court affirming the ALJ's decision granting ABKA a WIS. STAT. ch. 30 permit.

*By the Court.*—Order reversed.

¶ 54. BROWN, J. (*dissenting*). I join in the majority's commendation of the ALJ's work.[1] Unlike the majority, however, I agree with the ALJ's reasoning and conclusions. I would affirm the circuit court which affirmed the ALJ's decision.

¶ 55. At bottom, the engine powering the majority opinion is the thought that dockominiums are a marketing "scheme" or "creative manipulation" by which persons purport to sell the water within a boat slip space. The factual predicate for this idea is that the purchaser is not really a riparian owner in the normal sense of the term, but the owner of a lock-box, a small metal enclosure that looks like a post office box. The majority likens this to a ruse because the lock-box is absent any value without the ownership of the water within the slip. What the majority opinion attempts to do is to outlaw this marketing concept as antithetical to the public trust doctrine.

¶ 56. The factual predicate is wrong and, once we understand the true facts at hand, then the conclusion that the concept violates the public trust doctrine must fall. The purchasers here do not own simply a lock-box. They own more and when we understand what they own, it is apparent that they are common owners of riparian land. I quote the ALJ:

---

[1] The ALJ was Jeffrey Boldt.

827

The individual "condominium unit" owners individually own only a lock-box, similar to a post office box, located in the Harbor House. . . . The lock-box constitutes "the unit" within the meaning of sec. 703.02(15), Stats. The unit is separately and independently owned by each condominium owner and is intended for independent, private use. In itself, the lock-box does not confer riparian status on condominium unit owners.

However, the Declaration provides that the unit owners are tenants in common with each other of all of the common elements including all of the riparian real estate and improvements such as the Harbor House, seawall, sidewalk, boat launch, parking lot, docks and piers and swimming pool. . . . The legal question is whether holding such property in the form of a common element of a Condominium Declaration constitutes "riparian" status under sec. 30.12, Stats. Section 703.04, Stats., provides that: "A unit, together with its undivided interest in the common elements, for all purposes constitutes real property." The individual lock-box condominium unit owners are tenants in common in the property subject to the Declaration, including approximately 20 acres of riparian property and nearly 4200 feet of riparian shoreline property. . . . Accordingly, riparian status vests from holding these lands in common under the terms of the Declaration.

¶ 57. From the above passage, it is clear that the purchasers are more than simply owners of a lock-box. They are not bogus riparian owners. They share ownership of more shoreline than most individual owners of riparian land in this state. They also share twenty acres of total land. They further share ownership of a swimming pool and a Harbor House. Certainly, the owners do not live on the land. But there is no law that says they have to before they can be considered riparian owners. I think where the majority opinion goes wrong is that it

considers the purchasers to be fake riparian owners. They are not. They are real owners, albeit sharing the property in common.

¶ 58. The majority is disturbed by the marketing concept of the sellers. They are disturbed by the notion that the buyers will consider themselves owners of the water. The ALJ spoke to that as well. I quote the ALJ again:

> There is no question that the initial marketing of the dockominiums sought to blatantly sell public waters for private benefit. . . . While the language has been less blatant in recent versions, dockominium purchasers may still believe they are purchasing permanent rights in public waters as a result of the purchase of a condominium unit. Section 7.2 of the Declaration states that each boat slip owner will have "as a limited common element appurtenant exclusively to his unit . . . riparian rights to use of the space beside the pier or piers corresponding to his unit number." However, *it is clear that riparian rights derive not from the purchase of a unit as such, but from the common elements which include riparian lands.* (Emphasis added.)

¶ 59. The ALJ had it correct. The purchasers may *believe* they have bought ownership rights to the water. However, this does not mean that they actually own it. If ownership of the water is illegal, and it is, then they have bought only common ownership of the *terra firma* with right of access to the water. If they think they got a raw deal because they bought something they are not entitled to buy, their recourse is to sue the developer or the seller or even the broker for selling an illusion.[2]

---

[2] The majority cites *Palazzolo v. Rhode Island*, 533 U.S. 606, 121 S. Ct. 2448 (2001), for the proposition that it "suggests that a dockominium owner would have a ripened takings claim in

the future if the state, exercising its public trust doctrine responsibility, ever tried to interfere with the owner's entitlement to the appurtenant pier and boat slip." Majority at ¶ 48 n.6. I disagree with that characterization of *Palazzolo*.

Palazzolo has owned eighteen acres of "coastal wetlands" adjoining uplands in Rhode Island since 1959. *Id.* at 2455. At that time, he subdivided this property into eighty lots. He still owns seventy-four of them. *Id.* He desired to develop the land, but because most of it was marshland, he wanted to add dirt to raise the level of his lots and convert them to dry land capable of development. The applications were denied based on regulations in place before his purchase. *Id.* at 2456. He appealed. The case made its way to the United States Supreme Court.

Three issues were before the Court: (1) whether a regulatory takings claim is categorically barred whenever the enactment of the regulations predates the claimant's acquisition of the property; (2) whether a landowner must file additional applications seeking permission for "less ambitious uses" in order to ripen a takings claim; and (3) whether the remaining permissible uses of regulated property are economically viable merely because the property retains a value greater than zero. *Id.* at 2457–58. The Supreme Court held that: (1) the claims were ripe for adjudication, *see id.* at 2462; (2) acquisition of title after the effective date of the regulations does not bar a takings claim, *see id.* at 2464; and (3) since there was undisputed value of a portion of his land, he was precluded from making a claim that the denial deprived him of all economic use. *See id.*

*Palazzolo* was therefore about a person who owned *terra firma*; it was not about a person claiming to own a bed of water. It was about whether a regulation in place before an owner's purchase could bar his takings claim to land for which he had valid title. It was his land. He owned it. The Supreme Court said that even if he bought valid title after a regulation was in place, he could still claim that a takings occurred. The opinion says nothing about whether a person would have a takings claim for

about taking a piece of riparian land and selling it in condominium form so that the end result is many owners of that land. There is nothing inherently wrong with these owners sharing common access to the water and assigning between themselves who is going to get which boat slip. It is not as if the riparian rights are increased by increasing the number of owners. The riparian rights remain the same and those rights are regulated by the DNR. I fail to see how that violates the public trust doctrine. The bottom line is that the water is not sold because it cannot be sold. Any marketing scheme purporting to sell the water within the slip is the selling of an illusion. But we are not today faced with a question of whether the seller should be exposed to suit because it sold an illusion. Our purpose is to ask whether the dockominium owners are real riparian owners. If they are, then they have a right to put a pier in the water and sell the exclusive, perpetual right to have a pier in the water subject to DNR regulations. The bottom line is that a change in ownership is not a violation of the public trust doctrine and that is all this is: a change in ownership from one big hotel concern to many different persons who own big boats.

¶ 61. I add that I view the dockominium concept under the facts of *this* case as passing muster. If the purchasers were to own no riparian land and were sold only the pier slips, I believe that this status would be illegal. But this is because the purchasers would not be riparian owners, not because the purchasers believed they were purchasing ownership in the water appurtenant to a pier. I can think of several other instances where the dockominium project would probably not get

---

something he or she never validly owned in the first place. In sum, *Palazzolo* is totally irrelevant to the issues in this case, both factually and analytically.

off the ground. But this is not the time to discuss them. Suffice it to say, each project must stand or fall on its own facts.

¶ 62. Before leaving this subject, I quote the ALJ once more:

> [C]ondominium ownership of the marina does not in itself violate the public trust doctrine. Conversion of all of the pier slips to dockominium status would violate the public trust doctrine and would be detrimental to the public interest in maintaining public access to public waters. However, complete rejection of the proposed dockominium conversion would unfairly discriminate against the condominium form of ownership. Riparian owners in Wisconsin, including riparians who gain such a status by holding land in common through the condominium form of ownership, have the limited right to place a reasonable number of pier slips in public waters to gain access to said waters. The condominium unit-holders in this matter own riparian lands in common with other unit holders including ABKA. . . . Condominium unit-owning riparians are entitled to no more and no less access than other riparians.

¶ 63. I agree with the sentiments expressed by the ALJ. The dockominium concept is simply a creative means by which to convey riparian land. It does no violence, per se, to the public's right to use the waters. Riparians have always had rights of use to the water. The dockominium concept does not change that fact. These rights of use are regulated by the DNR on behalf of the public. This does not change with the advent of dockominiums.

¶ 64. If the public trust doctrine is not violated by the dockominium concept, then we get to the next two questions, whether the DNR had the power to reduce the number of slips that the condominium owners could

enjoy and, if so, whether the exercise of that power was reasonable. The parties briefed these issues voluminously and raised and argued subissues. If this were the majority opinion, I would address each point made. But in a dissent, it is unnecessary. All I need to do is get my point across.

¶ 65. ABKA notes that it originally had a permit from the DNR to put up 407 piers when it owned the property by itself. Since all that has occurred is a change in ownership from one owner to multiple owners of riparian land, ABKA asserts that there is no justification for the DNR to regulate the conversion. ABKA observes that this was always a private dock, never a public dock. It then reasons that the public trust doctrine is not violated by maintaining the status quo. ABKA argues that the riparian use is not changed and since it is not changed, the use of the waters is not changed and the DNR simply has no authority to come in absent a change in the use. ABKA therefore asserts that its permit is still good.

¶ 66. I disagree. As ABKA itself stated at oral argument, the docks in question here are meant to harbor big boats. I now quote a statement made during oral argument by ABKA's counsel: "This case is really about one rich person who leases versus one rich person who owns, not the average little guy who wants to take his family out for an outing. This is not a meaningful distinction relevant to the public trust doctrine." I agree that this case is about big boat owners who own riparian land versus big boat owners who lease slips on a seasonal basis. But just because we are not dealing with "the little guy" does not mean that the public trust doctrine is irrelevant.

¶ 67. The burning question is still *access*. The person who can afford to own a big boat, but who does

not have a riparian right, is entitled to access to the lake just as is the person with a similar size boat who does have riparian status. There are simply too few places in Wisconsin's inland waters for people with big boats. Lake Geneva is one lake where big boats can harbor. The DNR's concern here is about access to that lake. If ABKA's dockominium were to end up taking away all availability for leasing, the person who had a big boat but did not have riparian rights would have less access to the water. I would ask: where is that person going to go? This is why, in my opinion, the conversion plan is the business of the DNR, because the DNR is in the business of assuring access to everybody, even wealthy people.

¶ 68. And when the DNR looked at the facts surrounding the conversion plan, this is what it found, as evidenced from the record before the ALJ. There are three ways to access water: (1) by being a riparian owner, (2) by renting a slip, and (3) by public access. In the case of big boats, public access ramps are simply unfeasible. It takes time and money to launch these big boats and time and money to get them out. So, that leaves renting or riparian access. The ALJ cited testimony from a warden that ABKA's conversion would reduce the number of slips available on Lake Geneva by almost half. It stands to reason that if the number of available slips for big boats on Lake Geneva is reduced by half, access is compromised. That is just common sense. And that is what ultimately drove the DNR's determination in this case.

¶ 69. As the ALJ related, one witness testified how she and up to 100 of her friends were forced to leave the Abbey because of the high cost ($46,500) of purchasing a pier slip, paying taxes and meeting condominium assessments. Similar sentiments, along with

a deep sense of regret, at having been *forced off Lake Geneva* because of the high costs were expressed by another witness.

¶ 70. The ALJ correctly observed that the public trust doctrine reflects an effort by the law to balance the rights of riparians with the rights of the public in waters held in public trust. What constitutes reasonable use, under the common law test, is a factual determination, varying from case to case, which includes factoring the subject matter of the use and the occasion and manner of its application. The ALJ concluded that the "subject matter of the use" and the "occasion and manner of its application" at the Marina would be changed fundamentally if the entire Marina were converted to dockominium status and the boat slips were no longer regularly and consistently made available to the public by way of seasonal rental. I agree. I conclude that the DNR had the authority to step in to protect the owners of big boats who are not riparian owners. As I expressed before, these people are members of the public and entitled to access just like anyone else. The public trust doctrine is *not* irrelevant to these people as ABKA contends.

¶ 71. The only remaining question is whether the DNR's determination that 287 of the 407 slips remain available to the public is reasonable. Here, the DNR is accorded great discretion. The facts and circumstances support this determination. I would affirm the circuit court which affirmed the ALJ's decision which upheld the DNR's determination.